719 A.2d 262

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Steven C. DERK, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 23, 1997.

Decided Oct. 7, 1998.

Reargument Denied Dec. 11, 1998.

Michael G. Leonard, Hughesville, Keith B. DeArmond, for Steven C. Derk.

Barbara Ann Reed, Dist. Atty., Patrick T. Barry, Asst. Dist. Atty., for the Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## ORDER

PER CURIAM.

The Court being evenly divided, the Order of the Superior Court is affirmed.

NEWMAN, J., files an Opinion in Support of Affirmance in which CASTILLE and NIGRO, JJ., join.

CAPPY, J., files an Opinion in Support of Reversal in which FLAHERTY, C.J., and ZAPPALA, J., join.

## OPINION IN SUPPORT OF AFFIRMANCE

NEWMAN, Justice.

We granted review in this matter limited to the issue of whether Appellant's trial counsel was ineffective for failing to request a "corrupt source" jury instruction. For the reasons that follow, we affirm the Superior Court because the record shows that trial counsel had a reasonable trial strategy for failing to request that the trial court so charge the jury and thus, he was not ineffective.

## FACTS

A jury convicted Steven C. Derk (Derk) of, among other charges, first degree murder for the brutal beating death of a two-year-old child, Clair Hoyles, III ("little Clair"), the son of

Derk's live-in girlfriend, Tamie Gates (Gates).[1]  Derk received a life sentence for this murder.  Initially, both Derk and Gates were charged with criminal homicide in the death of little Clair.  However, Gates entered a negotiated plea agreement, by which she was permitted to plead guilty to the lesser offense of involuntary manslaughter in exchange for her cooperation at Derk's trial.[2]

At the trial of Derk, the Commonwealth's most incriminating testimony of his guilt came from Gates.  Gates testified to a course of violent conduct by Derk toward little Clair, which escalated from July 1992 until little Clair's death on August 7, 1992.  In particular, she related that Derk smashed a roll of tape into the child's chest, and, on the Monday before his death, smacked her son's head against the end of a couch.  She also testified as to Derk's abuse of her and her fear of his violent temper, his verbal threats and statements that he was going to kill little Clair and "kick his ass."

She further testified that at about 10:00 or 10:30 a.m. on August 6, 1992, the day before her son's death, she and Derk fought about a past due light bill.  During the fighting, little Clair began to cry and Derk swore at the child and sent him to his room.  Gates followed little Clair and began to play with him in his room.  Derk came to the doorway and continued to argue with Gates.  When she refused to take immediate action on the bill, Derk kicked little Clair.  He then grabbed the boy by the head and threw the child, stomach down, on the bed and grasped his right ankle, flipped him over and punched him in the stomach with a closed fist.  Gates said she heard a cracking sound following the punch, and screamed at Derk not to hit the child in that manner.  Derk responded, "I don't care if I kill him or not, he's not my son."

1.  The jury also convicted Derk of third degree murder, aggravated assault, recklessly endangering another person and endangering the welfare of children.

2.  Following Derk's trial, the trial judge rejected Gates's plea agreement, presided over a separate trial of Gates and the jury convicted her of third degree murder, aggravated assault and endangering the welfare of children.

According to Gates, little Clair became ill in the evening of August 6, at about 11:00 p.m. and began vomiting throughout the night, and that both she and Derk were up with the child. She testified that Derk went to bed at 4:30 a.m., while she remained with little Clair on the living room couch. The child finally fell asleep about 8:30 a.m. on Friday, August 7, 1992 and Gates left little Clair on the couch and went to bed. At approximately 10:00 a.m. that same morning, Gates heard a thud and discovered the toddler lying with his head on the top of the stairs in the apartment. Gates, at Derk's suggestion, took the child to the kitchen and fed him some chicken soup. After feeding him, Gates noticed that little Clair was cold to the touch so she and Derk put him in the tub. When Derk set him down in the water, the child fell, and at that point in time Gates became extremely concerned and insisted on taking little Clair to the hospital.

Derk called 911 and the emergency dispatch sent an ambulance to the apartment. Gates testified that her concern for little Clair had finally overtaken her fear of Derk so that she demanded medical treatment for the child. Gates told the technician that little Clair had fallen down the steps. When the paramedic arrived at the scene and inquired about how long the child had been unresponsive, Gates replied that little Clair had banged his head against the wall. Little Clair was transported to the Sunbury Hospital where he was pronounced dead.

At trial, the Commonwealth's forensic pathologist testified that little Clair sustained three areas of fatal injury: to his head, neck, and abdomen, which were inflicted at varying times before the child's death. His head injuries included linear skull fractures, epidural hemorrhaging, and brain herniation. The extent of the damage to the brain was consistent with the child having been dropped from a multistory building. The Commonwealth pathologist testified that brain herniation was probably the cause of death, and that the head injuries were inflicted twenty-four to forty-eight hours before death. He opined that blunt force trauma caused the head injuries.

The injury to little Clair's abdomen included blunt force trauma with damage to an abdominal artery and internal organs so severe that blood was in his abdomen. The pathologist testified that these injuries occurred twenty minutes to three hours before death. The injuries to the boy's neck area included evidence of manual strangulation, bleeding in the "Adam's Apple" region and in front of the spinal column, consistent with "shaking" baby syndrome. The child's neck ligaments were completely torn, presumably from repeated shaking. The injuries to the front of the neck occurred within days before death, and the injuries to the spinal column occurred within minutes to hours of death.

The pathologist recounted to the jury the child's multiple signs of blunt force trauma, manual strangulation and "shaking baby syndrome," with more than 100 distinct bruises covering his complete body. The child had bruises on his entire face, around both of his eyes and on his forehead. He had bruises around his arms, chest, abdomen, both lower legs, his back, and buttocks. The size and shape of the bruises on his back and buttocks indicated repeated blows with a fist, hand, foot, or toes. There also was a large bruise over the right side of his head covering the ear, forehead, and eye. The right eye was swollen shut. The Commonwealth showed the jury pictures of these injuries.

In addition to the testimony of Gates and the pathologist, the Commonwealth presented the testimony of several neighbors and acquaintances, who testified that they overheard Derk verbally abuse the child, threaten to "fucking kill him" and to "smash little Clair against the wall." One neighbor, Karen Treas, testified that she saw Derk grab little Clair under the arm and back of the head, and while holding him by the hair, forcibly place him on a step in the apartment. Ms. Treas also testified that on the night of the murder, she heard Gates say "knock it off, leave him alone, that's enough." N.T. (Vol.I) at 202, 210.

The Commonwealth also presented testimony that a number of witnesses, including Tamie Gates' mother, saw little Clair with bruises that never went away and that Derk would make

unbelievable excuses as to the nature of the bruises. Gates' mother testified that she became so concerned as to the bruises on the child that she had made an appointment to take the boy to the doctor just days before his death. (This appointment never materialized because Gates prevented her mother from seeing the child on the scheduled date.)

At trial, defense counsel argued that Gates, and not Derk, had committed the murder, pointing primarily to the time frames that the pathologist attributed to the child's injuries and the inconsistencies in Gates' testimony of events. Nonetheless, the jury convicted Derk of the murder. Following his conviction and sentence, Derk appealed to the Superior Court, which affirmed the trial court. We granted review on the sole issue of whether defense counsel was ineffective for failing to request that the court instruct the jury that Ms. Gates was a "corrupt" source since she was an accomplice to the murder.

**ANALYSIS**

To show that trial counsel was ineffective, appellant must establish that his claim has arguable merit; that trial counsel had no reasonable basis for proceeding as he did; and that the alleged ineffectiveness worked to his prejudice. *Commonwealth v. Pierce*, 537 Pa. 514, 525, 645 A.2d 189, 194–195 (1994). The burden of establishing counsel's ineffectiveness is on the Appellant. *Id.* Here, Derk has not met this burden.

Our previous decisions in *Commonwealth v. Karabin*, 493 Pa. 249, 426 A.2d 91 (1981), and *Commonwealth v. Johnson*, 496 Pa. 546, 437 A.2d 1175 (1981), control this case. In both *Karabin* and *Johnson*, we rejected claims that trial counsel was ineffective for failing to request an "accomplice" instruction as long as some reasonable basis for the attorney's decision appeared in the record.

In *Karabin*, a jury convicted appellant of murder and reckless endangerment. One of the Commonwealth's witnesses was a young woman with whom the appellant had an affair and who was in the car with the appellant when, nearby, he shot one of the victims. The strategy of the defense was to convince the jury that appellant was innocent of the crimes

and that this witness was lying because she was jealous of his relationship with another woman. We rejected the appellant's arguments that trial counsel was ineffective for not requesting an accomplice instruction regarding the witness' testimony. We concluded, "trial counsel was not ineffective in failing to request an accomplice instruction. Instead, it was a trial tactic of an obvious sort: Karabin's defense was that he did not perform the shootings. To request the accomplice instruction could derogate that defense." *Id.* at 252–253, 426 A.2d at 92.

In *Johnson,* a jury convicted the appellant of, among other crimes, murder in the first degree. The murder was gang related. One of the Commonwealth's witnesses was the leader of a splinter group of the gang, who may have been a conspirator in the murder. The defense strategy was that the witness was framing the appellant for the murder. We held that "since it is clear from the record that failure to request the discretionary accomplice instruction was within the realm of counsel's trial strategy, it cannot be held to constitute ineffectiveness." *Id.* at 550, 437 A.2d at 1177.

The Superior Court, following our decisions in *Karabin* and *Johnson,* has also stated that trial counsel is not ineffective for failing to request an accomplice jury instruction where the defendant's defense is that he or she was not involved in the perpetration of the crime. *See, e.g., Commonwealth v. Quarles,* 361 Pa.Super. 272, 522 A.2d 579 (1987), *appeal denied,* 517 Pa. 592, 535 A.2d 82 (1987); *Commonwealth v. Gainer,* 397 Pa.Super. 348, 580 A.2d 333 (1990), *appeal denied,* 529 Pa. 645, 602 A.2d 856 (1992). In *Quarles,* the jury convicted appellant of, among other crimes, murder. The appellant contended that his trial counsel was ineffective because counsel did not request an "accomplice" jury instruction. The Superior Court held that trial counsel was not ineffective, because the failure to request the instruction was a reasonable trial strategy in the face of appellant's defense that he was not at the scene of the crime. The Superior Court cogently stated that, "appellant's trial counsel could not logically argue that appellant had an accomplice to a crime appellant maintains

that he did not commit because he has an alibi. Appellant's counsel consequently reasonably chose to forego requesting an accomplice charge." *Id.* at 279, 522 A.2d at 581. Likewise, the Superior Court in *Gainer* determined that trial counsel was not ineffective for failing to request an accomplice instruction. In *Gainer,* appellant was on trial for arson. An accomplice instruction would "have been inconsistent with appellant's defense that he did not set the fire but was elsewhere at the time of the conflagration." *Id.* at 358, 580 A.2d at 338.

It is well settled that whether to request additional points for charge is one of the tactical decisions "within the exclusive province of counsel." *Commonwealth v. Sullivan,* 450 Pa. 273, 299 A.2d 608, 610 (1973), *cert. denied,* 412 U.S. 923, 93 S.Ct. 2745, 37 L.Ed.2d 150 (1973). We should not invade that province and declare counsel ineffective if any reasonable basis for counsel's decision existed at the time of trial. *Commonwealth v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). Rather, we should scrupulously follow the presumption that attorneys act in the interests of their clients, and insist that Appellant meet his burden of proving that his attorneys had no reasonable basis for their action. *See, e.g., Commonwealth v. Watson,* 523 Pa. 51, 65, 565 A.2d 132, 139 (1989).

■ Here, a review of the record amply supports a conclusion that trial counsel had some reasonable basis for not requesting the accomplice charge. Counsel argued that Derk was innocent, and the defense strategy was to show that Ms. Gates killed Little Clair. For example, during the closing argument, Derk's counsel told the jury that, "Mr. Derk is innocent of these charges." N.T. (Vol.4) at 109. He proceeded to pose the question to the jury, "was it Steven or was it Tamie? Tamie Gates is on trial today as much as Steven Derk is." N.T. (Vol.4) at 112. Counsel further told the jury that Gates was "covering up her own story." N.T. (Vol.4) at 124. He then recounted all of the evidence that pointed to Derk's innocence and that Gates killed the child, not Derk. N.T. (Vol.4) at 124–152. At one point in his closing, Counsel even explicitly told the jury, "Now what happened? She is writing him [Derk] letters, look how much I love you, **because**

**she did it** [killed little Clair]." N.T. (Vol.4) at 145 (emphasis added). Thus, an accomplice instruction would have been inconsistent with Derk's defense that he did not kill the child, and it was a reasonable tactical consideration for trial counsel not to request an accomplice jury instruction. Our inquiry should end there. As we stated in *Commonwealth v. Maroney,* 427 Pa. at 604, 235 A.2d at 352:

> We cannot emphasize strongly enough, however, that our inquiry ceases and counsel's assistance is deemed constitutionally effective once we can conclude that the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests.

*Accord, Commonwealth v. Pierce,* 515 Pa. 153, 158–59, 527 A.2d 973, 975 (1987).

Moreover, simply because Gates was indicted for the same crime does not mean that an accomplice instruction is automatically warranted. Instead, the correct analysis is that an accomplice instruction is appropriate only when the evidence produced at trial permits a reasonable inference that a witness actively participated in, or solicited, the crime charged. *See, e.g., Commonwealth v. Manchas,* 430 Pa.Super. 63, 633 A.2d 618 (1993), *appeal denied,* 539 Pa. 647, 651 A.2d 535 (1994); *Commonwealth v. Phillips,* 411 Pa.Super. 329, 601 A.2d 816 (1992), *affirmed,* 534 Pa. 423, 633 A.2d 604 (1993) (per curiam).

The Superior Court in *Manchas* determined that a corrupt source jury instruction was not required where the Commonwealth witness was present in the home during a murder, although the witness had previously been charged with the crime. The Superior Court held that "the mere fact that [the witness] had at one time been arrested and charged in connection with the crime did not give rise to an inference that he was an accomplice where there was no evidence presented at trial to indicate that he, in any way, had aided in the murder." *Id.* at 82, 633 A.2d at 628.

In *Phillips,* the appellant was on trial for conspiracy, robbery, and aggravated assault. One of the Commonwealth's

witnesses, Leander Speed (Speed), accompanied the appellant to the scene of the crime, waited in the car for him to return, and then fled the vicinity. Speed was charged as a co-conspirator, but entered a plea bargain in which he pled guilty to receiving stolen property and conspiracy to receive stolen property. After entering the plea, Speed cooperated with the Commonwealth. At trial, Speed testified that he did not know of the criminal actions until after appellant came back to the car, and further testified that he did not share in the stolen property. The *Phillips* court determined that the trial court did not commit error when it refused to give an accomplice charge to the jury because the testimony at trial did not establish that Speed actively participated in the crime. At most, it showed that Speed was an accessory after the fact and not an accomplice.

In this case, like in *Manchas* and *Phillips*, the record shows that the Commonwealth did not present evidence at Derk's trial suggesting that Gates actively participated with Derk in the crimes against little Clair. Nor did the evidence suggest that she solicited Derk to commit the crimes. Therefore, the evidence at trial did not mandate a "corrupt source" or "accomplice" instruction. For these reasons, we affirm the decision of the Superior Court.

CASTILLE and NIGRO, JJ., join this opinion.

## OPINION IN SUPPORT OF REVERSAL

CAPPY, Justice.

The question presented in this appeal is whether a remand is necessary to decide if trial counsel was ineffective for failing to request a "corrupt source" jury instruction.[1] For the

---

**1.** The "corrupt source" jury instruction as found in the Pennsylvania Standard Jury Instructions (Criminal) (revised October 1981) at Section 4.01, provides as follows:

(1) When a Commonwealth witness was so involved in the crime charged that he was an accomplice his testimony has to be judged by special precautionary rules. Experience shows that an accomplice, when caught, will often try to place the blame falsely on someone else. (He may testify falsely in the hope of obtaining favorable treatment, or

reasons that follow, I believe a remand is necessary to resolve that issue.

Appellant was charged with murder in the first degree, murder in the third degree, aggravated assault, recklessly endangering another person, and endangering the welfare of children.[2] These charges stemmed from the brutal beating death of a two-year-old child, Clair Hoyles, III.

Clair Hoyles, III, known as little Clair, was the two-year-old son of Tamie Gates and Clair Hoyles, II. Although little Clair's parents did not marry, they lived together with little Clair until September of 1991, separating shortly after the child's first birthday. Tamie and little Clair remained in the apartment the family had shared, at N–4, Pine Meadows Apartments in Selinsgrove Borough, Pennsylvania. In the spring of 1992 Tamie began dating appellant. In late May or

for some corrupt or wicked motive.) On the other hand, an accomplice may be a perfectly truthful witness. The special rules that I shall give you are meant to help you distinguish between truthful and false accomplice testimony.

(2) [In view of the evidence of _____'s criminal involvement you must regard him as an accomplice in the crime charged and apply the special rules to his testimony.] You must decide whether _____ was an accomplice in the crime charged. If after considering all the evidence you find that he was an accomplice then you must apply the special rules to his testimony, otherwise ignore those rules. Use this test to determine whether _____ was an accomplice: (An accomplice may be defined as a person who knowingly and voluntarily cooperates with or aids another in the commission of a crime.)

(3) These are special rules that apply to accomplice testimony:

*First*, you should view the testimony of an accomplice with disfavor because it comes from a corrupt and polluted source.

*Second*, you should examine the testimony of an accomplice closely and accept it only with care and caution.

*Third*, you should consider whether the testimony of an accomplice is supported, in whole or in part, by other evidence. Accomplice testimony is more dependable if supported by independent evidence. [However, even if there is no independent supporting evidence you may still find the defendant guilty solely on the basis of an accomplice's testimony if, after using the special rules I just told you about, you are satisfied beyond a reasonable doubt that the accomplice testified truthfully and the defendant is guilty.]

**2.** *See* 18 Pa.C.S. § 2502(a) and (c); 18 Pa.C.S. § 2702; 18 Pa.C.S. § 2705; and 18 Pa.C.S. § 4304.

early June of 1992 appellant moved into apartment N–4 with Tamie and little Clair.

The Pine Meadows Apartment complex consists of connected townhouses that share common walls. The neighbors live in close proximity and the construction of the complex is such that neighbors can overhear the activities of each other when the noise level within an adjoining apartment is increased.

In July of 1992 Doris Nieves, the resident of apartment N–3, which shares a common wall with Tamie's apartment, complained to the apartment complex manager, Barbara Demshock. Mrs. Nieves complained that she overheard loud arguments between Tamie and appellant which caused her to be concerned for little Clair. Mrs. Nieves specifically overheard appellant threaten to "smash little Clair against the wall." Mrs. Nieves also overheard Tamie swear at the child referring to him as "you little f———" and "you a———."

Mrs. Demshock spoke to Tamie about Mrs. Nieves complaints. Mrs. Demshock told Tamie that she and Mrs. Nieves were concerned about her welfare and the welfare of her child, and offered assistance. Tamie replied that there was nothing wrong and the neighbors were just being nosy.

Karen Treas, the resident of apartment N–5, also overheard loud arguments between Tamie and appellant after appellant moved into apartment N–4. Mrs. Treas overheard appellant threaten to kill little Clair. On one occasion when Mrs. Treas was visiting Tamie in apartment N–4, Mrs. Treas observed little Clair immediately begin to cry when appellant entered the apartment. Appellant became angry with little Clair, screaming at the child, and grabbing him under the arm and by the hair. Holding the child by the hair, appellant forcibly placed little Clair on the steps, directing the child to go to his room. When the child continued to cry making no movement towards his room, appellant "pounded little Clair on his butt." Mrs. Treas stated that Tamie told appellant to stop, but appellant responded "he has to learn to stop his balling, he's such a little pussy ass." Tamie made no physical move to intervene according to Mrs. Treas testimony.

During the summer of 1992 appellant would attend the car races at the Selinsgrove Speedway, often accompanied by little Clair. Bradley Simcox, a friend of appellant, observed appellant and the child together at the racetrack. Mr. Simcox regularly observed bruises on little Clair. Mr. Simcox questioned appellant about the constant bruising on the child. One explanation offered by appellant was that some older children at a baseball game struck the child. Another time when Mr. Simcox again questioned appellant about the bruises, appellant replied that the child was removed from day-care because other children were picking on him at the day-care center. Mr. Simcox found the explanations unsatisfactory given the child's condition.

Tina Schlief, Tamie's mother, testified that during the summer of 1992 she became suspicious about bruises frequently appearing on little Clair. When she would raise the issue to Tamie, she received explanations that failed to satisfy her suspicions. She became so concerned that she made an appointment for 6:30 p.m. on August 6, 1992 to take the child to a doctor to examine the bruises. In arranging to take little Clair, Mrs. Schlief told Tamie that she wanted to take little Clair to a carnival that evening. On Wednesday, August 5, 1992, Tamie called Mrs. Schlief and told her that Tamie and appellant would be taking little Clair out Thursday and Mrs. Schlief could not have him that evening. Mrs. Schlief went to Tamie's apartment anyway on Thursday evening. Mrs. Schlief observed Tamie's car in the parking area and knocked on the door. Although Tamie, appellant and little Clair were home, they turned off the lights and did not respond to Mrs. Schlief's knock.

Tamie testified that appellant ordered her not to respond to her mother's knock. The following morning, August 7, 1992, little Clair was pronounced dead. Tamie testified at appellant's trial pursuant to a plea bargain agreement with the Commonwealth. Tamie had been jointly charged with appellant for the murder of little Clair. Following the preliminary hearing Tamie agreed to testify against appellant in exchange

for a plea to involuntary manslaughter and conspiracy to commit voluntary manslaughter.[3]

Tamie provided background of the events which led to the death of little Clair on the morning of August 7, 1992. Tamie testified that she resided with appellant and little Clair during the spring and summer of 1992 in apartment N–4 of the Pine Meadows complex. According to Tamie's testimony appellant's attitude towards little Clair changed after an incident where the child fell while in appellant's care. On June 16, 1992 Tamie and appellant brought little Clair to the Sunbury Hospital emergency room because the child had fallen down the steps while alone with appellant. Little Clair was treated for facial contusions and bodily injury. Tamie testified that she remained with little Clair in the emergency room while appellant waited in the parking lot. Tamie stated that the emergency room physician made her feel as if she were being accused of child abuse.

After that incident appellant prevented her from seeking medical treatment for little Clair by threatening her that Children and Youth Services would remove the child from her care. Tamie also testified that she was physically afraid of appellant, which prevented her from obtaining treatment for her child. Tamie stated that appellant had thrown her up against the wall and punched her in the stomach. Although her fear of appellant prevented her from interceding when appellant hit little Clair, she would scream at appellant not to strike the child.

Tamie and appellant disagreed over proper measures of discipline for the child. Although Tamie admitted that she often screamed and swore at the child, she stated that only appellant struck the child. According to Tamie the blows to the child were often intended as discipline for behavior exhibited by little Clair. Tamie did state that on one occasion she observed appellant smack little Clair's head on the wooden arm of the couch for no apparent reason. This incident occurred four days prior to the child's death. Tamie verbally

3. The trial court rejected the plea. Subsequently Tamie Gates was convicted, by a jury, of third degree murder.

chastised appellant but took no action to obtain medical help for little Clair.

The events immediately preceding the child's death began with an argument between appellant and Tamie over a past due light bill. When little Clair began to cry appellant swore at the child and sent him to his room. Tamie became frustrated with appellant and went to little Clair's room to play with the child. Tamie found the child hiding under the dresser. After coaxing him out she and little Clair went back downstairs. However, appellant began screaming again, the child began crying again, and appellant again, ordered little Clair to his room.

Tamie followed little Clair to his room and once again found him hiding under the dresser. She coaxed the child out and they began to play together in little Clair's room. Appellant came to the doorway and continued to argue with Tamie. When Tamie refused to take immediate action on the light bill appellant kicked his foot towards Tamie and little Clair. Tamie blocked the kick with her arm, however, appellant's foot made contact with little Clair's head. Appellant then grabbed little Clair by the head and threw the child, stomach down, on the bed. Tamie jumped on appellant's back and tried, unsuccessfully, to hold his arms. Appellant grabbed little Clair's right ankle flipped him over and punched him in the stomach with a closed fist. Tamie said she heard a cracking sound following the punch, and screamed at appellant not to hit the child in that manner. Appellant responded "I don't care if I kill him or not, he's not my son." Tamie testified that this altercation, which occurred between 10:00 and 10:30 a.m. on August 6, 1992, was the last physical contact between appellant and little Clair before little Clair's death.

Appellant then left the apartment for approximately twenty minutes. Tamie did not leave because appellant took her car keys. While appellant was out, Tamie fed little Clair lunch. When appellant returned, he and Tamie took little Clair down to the river for a walk. Tamie testified that the child was fine and was playing and throwing sticks in the water. The rest of the afternoon was uneventful. However, that evening when

her mother came by appellant forced her not to respond to her mother's knock. Tamie went along with appellant because of her fear that appellant would cause physical harm to herself and little Clair.

Later that evening, about 11:00 p.m., little Clair became ill and began vomiting. Tamie testified that she and appellant both provided care for the child. At 1:00 a.m. appellant drove to a store to get Sprite to settle little Clair's stomach. Unable to settle the child down to sleep, Tamie sent appellant to bed at 4:30 a.m., while she remained with little Clair on the living room couch. At 8:00 a.m. on the morning of Little Clair's death Mrs. Nieves, the tenant of apartment N–3, heard Tamie scream at the child "go to sleep a."

The child finally fell asleep about 8:30 a.m. Tamie left little Clair on the couch and went to bed. About 10:00 a.m. Tamie heard a thud and discovered little Clair lying with his head on the top step. Tamie, at appellant's suggestion, took the child to the kitchen and fed him some chicken soup. Tamie testified that appellant was so upset about the child's condition that appellant punched a hole in the kitchen wall. After feeding the child, Tamie noticed that he was cold to the touch so she and appellant put him in the tub. When appellant set him down in the water the child fell over. At that point Tamie became extremely concerned and insisted on taking little Clair to the hospital.

Appellant called 911 and the emergency dispatch sent an ambulance to the apartment.[4] Tamie testified that her concern for little Clair had finally overtaken her fear of appellant so that she demanded medical treatment for the child.

Upon responding to the call the emergency medical technician observed Clair Hoyles, III, lying on the floor with Tamie attempting mouth to mouth resuscitation. Tamie told the technician that little Clair had fallen down the steps. When the paramedic arrived at the scene and inquired as to how

4. The dispatch operator testified that the name given by the caller was Peter Derr, not Steven Derk.

long the child had been unresponsive, Tamie replied "he kept banging his head against the wall."

Little Clair was transported to the Sunbury Hospital where he was pronounced dead. An autopsy was performed. The external examination of the body revealed a multitude of bruises indicative of direct blunt trauma. There were bruises over the entire face, around both eyes and on the forehead. There were bruises around the arms, on the chest, the belly and both lower legs. The back showed a multitude of oval shaped bruises. The buttocks showed circular bruises cropped together, indicating repeated blows with either a fist, hand, foot or toes. A particularly large bruise covered the right side of the head encompassing the ear, forehead and eye. The right eye was swollen shut. The jaw revealed four contact points where someone had forcibly grabbed the jaw. The throat revealed scratches consistent with strangulation. The external examination revealed over 100 distinct bruises caused by blunt force trauma.

The internal examination revealed severe blunt force trauma to the brain. The extent of the damage to the brain was consistent with the child having been dropped from a multistory building. The neck and spine indicated signs of strangulation and shaken baby syndrome. Blood was found in the belly caused by damage to an abdominal artery. The internal organs showed severe trauma.

Little Clair suffered three distinct lethal injuries. Blunt force trauma to the head, occurring within hours to a day before death. Blunt force trauma to the abdomen occurring within hours to a day before death. Strangulation and/or shaken baby syndrome occurring within minutes to two hours before death.

Immediately after little Clair's death Chief Hartly of the Borough of Selinsgrove Police Department questioned Tamie Gates. Tamie told the Chief that little Clair repeatedly banged his head on the floor and walls. When asked if she sought medical treatment for the child, Tamie replied in the negative. Tamie explained that she was afraid of accusations

of child abuse. When asked on direct examination why she entered a plea of guilty to the charges of involuntary manslaughter and conspiracy to commit voluntary manslaughter, she replied "I'm guilty of not being able to protect my son."

Following the close of evidence in appellant's trial the jury returned a verdict of guilty on all counts, the trial court denied post-trial motions. Appellant was sentenced to life imprisonment on the first-degree murder count; no other sentences were imposed. The Superior Court affirmed the judgment of sentence. This court granted the Petition for Allowance of Appeal, limited to the issue of trial counsel's ineffectiveness for failing to request a "corrupt source" jury instruction.

The burden of establishing counsel's ineffectiveness is on appellant, as counsel is presumed effective. *Commonwealth v. McNeil,* 506 Pa. 607, 487 A.2d 802 (1985). To satisfy the burden appellant must first prove that the tactic, argument, or issue, which counsel has forgone, and which forms the basis of the claim of ineffectiveness, is of arguable merit. *Commonwealth v. Durst,* 522 Pa. 2, 559 A.2d 504 (1989). Once this threshold has been met, the reviewing court must ascertain whether counsel had a reasonable basis for his action or inaction. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). If the reviewing court determines that there was no reasonable basis for counsel's chosen course, then appellant must demonstrate that counsel's ineffectiveness so prejudiced appellant that it had an adverse effect on the outcome of the case. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

We turn first to the question of prejudice. If appellant has not been prejudiced by the ineffectiveness of counsel then our inquiry would end. *Commonwealth v. Travaglia,* 661 A.2d 352 (Pa.1994). Thus, we must consider whether counsel's failure to request a corrupt source charge so prejudiced appellant that it had an adverse effect on the outcome of the case.

The testimony of Tamie Gates was the crucial piece of evidence against appellant. Without Tamie's testimony the case against appellant was circumstantial. Both Tamie and

appellant were alone with little Clair during the relevant time period as the medical examiner testified that the lethal injuries suffered by the child occurred within minutes to a day preceding death. Although the neighbors overheard threats appellant made towards the child, those same neighbors overheard Tamie screaming and swearing at little Clair. When Tamie's mother made arrangements to take little Clair to the doctor because she was suspicious about the constant bruises on the child, she did not tell Tamie her intent. Instead Mrs. Schlief told Tamie that she wanted to take little Clair to a carnival. The medical examiner found scratches on little Clair's throat consistent with strangulation. Chief Hartley testified that appellant's fingernails were so short that it was impossible to take scrapings. No attempt was made to take scrapings from the fingernails of Tamie Gates. Tamie Gates was alone with little Clair from 4:30 a.m. to 8:30 a.m. the morning he died. At 8:00 a.m. Mrs. Nieves, the neighbor in apartment N–3, overheard Tamie scream at little Clair "go to sleep you a———."

The "corrupt source" charge is designed specifically to address situations where one accomplice testifies against the other to obtain favorable treatment. The words of the suggested charge itself are the strongest presented to a jury for consideration of a witness' testimony.

Experience shows that an accomplice, when caught, will often try to place the blame falsely on someone else. He may testify falsely in the hope of obtaining favorable treatment, or for some corrupt or wicked motive. ... First, you should view the testimony of an accomplice with disfavor because it comes from a corrupt and polluted source. Second, you should examine the testimony of an accomplice closely and accept it only with care and caution.

Pennsylvania Standard Jury Instruction (Criminal) (revised October 1981) Section 4.01.

However, instead of this strong admonition to carefully scrutinize the testimony of Tamie Gates, a named co-defendant, the jury was instructed as follows:

Ms. Derk (sic), a co-defendant in this case, has also testified. You have received testimony regarding a plea agreement which she has entered, and part of the plea agreement was that she would testify in this case. You should subject her testimony to the same scrutiny that you would any other witness. You should not necessarily believe or disbelieve her testimony simply because she is testifying by virtue of her entering into a plea agreement in this matter. Simply because she has chosen to testify again does not mean that you are permitted to draw any adverse inference against the defendant as a result of him exercising his right not to testify in this matter.

If the jury had been instructed to consider the testimony of Tamie Gates as coming from a corrupt and polluted source, that she had a strong motive for her testimony as it deflected guilt from herself, and that they should consider her words with caution; there is a reasonable probability that the verdict against appellant would have been different. Thus, we must turn to a consideration of the arguable merit of appellant's claim.

A "corrupt source" instruction is warranted in any case where an accomplice offers testimony implicating the defendant. *Commonwealth v. Chmiel,* 536 Pa. 244, 639 A.2d 9 (1994). To be an accomplice one must have knowledge of and participate in the specific crime charged. *Commonwealth v. Bricker,* 525 Pa. 362, 581 A.2d 147, 151 (1990); *Commonwealth v. Thomas,* 479 Pa. 34, 387 A.2d 820, 822 (1978). "The general rule for determining whether a witness is an accomplice is 'whether or not he could be indicted for the crime for which the accused is charged.'" *Commonwealth v. Sisak,* 436 Pa. 262, 259 A.2d 428, 431 (1969), *quoting, Commonwealth v. Hopkins,* 165 Pa.Super. 561, 69 A.2d 428 (1949).

In the instant case we need not examine the evidence to determine if it permits an inference that Tamie Gates was an accomplice. In this case Tamie Gates was in fact indicted for the same crimes as appellant. Therefore Tamie Gates was an accomplice and appellant was entitled to the "corrupt source"

instruction. *Commonwealth v. Coades,* 454 Pa. 448, 311 A.2d 896, 898 (1973).

As we find appellant has raised a claim of arguable merit which projects potential prejudice we must reach the question of whether counsel had a reasonable trial strategy for failing to request a "corrupt source" instruction regarding the testimony of Tamie Gates. The Commonwealth argues that to request the corrupt source charge would derogate counsel's chosen strategy. The defense strategy was to focus on Tamie Gates as the sole murderer.

Appellant presented witnesses who testified that appellant enjoyed a close relationship with little Clair, and in fact, Tamie was jealous of that relationship. Other defense witnesses testified that Tamie had a temper and would physically attack appellant.

During cross-examination Tamie admitted that in her statement to the Commonwealth pursuant to the plea agreement, she had lied.[5] Cross-examination raised serious questions as to the credibility of Tamie's testimony that she failed to intercede in appellant's abuse of her son because of her fear of appellant. This portion of Tamie's testimony was undercut by evidence of her continuing assertions of her love for appellant after the death of little Clair. Tamie wrote to appellant's family stressing her love for appellant while she was in prison. Cross-examination also revealed the fact that Tamie gave birth to appellant's son while she and appellant were in jail awaiting trial on charges of murdering little Clair. Tamie's sudden change in her attitude towards appellant coincided with her acceptance of the plea bargain agreement.

Clearly counsel's trial strategy was to assert appellant's innocence by focusing on Tamie Gates as the sole guilty party. The Commonwealth asserts that requesting the "corrupt source" charge would derogate the defense strategy by placing before the jury the concept that appellant and Tamie were

**5.** In fact the prosecutor acknowledged that there were serious inconsistencies between Tamie Gates pretrial statements and her trial testimony. The prosecuting attorney advised the jury in his closing argument not to believe everything that Tamie Gates, his star witness, said.

accomplices. To argue that it would derogate counsel's chosen strategy to tell the jury that Tamie was an "accomplice" is questionable when the jury was in fact told that Tamie was a co-defendant. The Commonwealth would have this court believe that a jury would be more likely to look with disfavor on appellant if Tamie were his "accomplice" rather than his "co-defendant." Without more than this bare bones assertion, we find such reasoning disingenuous.

However, without a full record the question of whether trial counsel possessed a reasonable trial strategy, designed to effectuate appellant's interest, that was served by the omission of the "corrupt source" charge, cannot be answered. In the instant case the question of counsel's ineffectiveness was raised for the first time before the Superior Court.[6] Thus, the trial court was without the opportunity to assess the merits of counsel's chosen strategy. Given the fact that the testimony of Tamie Gates was so crucial to the resolution of this case, and that trial counsel vigorously attacked her credibility on cross-examination, the answer to our query as to a reasonable trial strategy is not apparent from a cold reading of the record before this court.

Where the reviewing court can ascertain from the record that counsel lacked a reasonable trial strategy for failing to pursue a particular course of conduct, a remand to address the issue is unnecessary. *See, Commonwealth v. McBee,* 513 Pa. 255, 520 A.2d 10 (1995); *Commonwealth v. Brinkley,* 505 Pa. 442, 480 A.2d 980 (1984); *Commonwealth v. Morin,* 477 Pa. 80, 383 A.2d 832 (1978). However, where the record in a case is incomplete, or there are factual questions, which cannot be resolved without further proceedings, then a remand is necessary to fully evaluate an ineffectiveness claim. *See, Commonwealth v. DeGeorge,* 506 Pa. 445, 485 A.2d 1089 (1984); *Commonwealth v. Byrd,* 493 Pa. 178, 425 A.2d 722 (1981); *Commonwealth v. Musi,* 486 Pa. 102, 404 A.2d 378

6. The appeal to the superior court was the first opportunity appellant had to raise this issue as it was the first time he was represented by counsel other than trial counsel. *Commonwealth v. Pizzo,* 529 Pa. 155, 602 A.2d 823 (1992).

(1979); and *Commonwealth v. Connolly,* 478 Pa. 117, 385 A.2d 1342 (1978).

Thus, although I find that counsel's failure to request a "corrupt source" instruction regarding the testimony of Tamie Gates raises a claim of arguable merit, I am unable to ascertain from the record whether or not counsel possessed a reasonable trial strategy for failing to request the "corrupt source" instruction. Because the failure of counsel to request the "corrupt source" charge, absent a reasonable trial strategy designed to effectuate appellant's interests, would prejudice appellant, a remand of this matter to the trial court for a hearing on the ineffectiveness issue is necessary.

Accordingly, I believe the decision of the Superior Court should be reversed and the case remanded to the trial court for a hearing consistent with this opinion.

FLAHERTY, C.J., and ZAPPALA, J., join this Opinion in Support of Reversal.