2021 CO 70 The People of the State of Colorado, Petitioner v. Dylan Thomas Coons, Respondent No. 19SC485
Supreme Court of Colorado, En Banc
September 27, 2021

 Certiorari to the Colorado Court of Appeals

 Attorneys for Petitioner: Philip J. Weiser, Attorney General
William G. Kozeliski, Senior Assistant Attorney General
Denver, Colorado

 Attorneys for Respondent: Megan A. Ring, Public Defender
Britta Kruse, Lead Deputy Public Defender Denver,
 Colorado

 JUSTICE SAMOUR delivered the Opinion of the Court.

 JUSTICE GABRIEL concurs in the judgment, and JUSTICE HOOD and
 JUSTICE HART join in the concurrence in the judgment.

 OPINION

 SAMOUR, JUSTICE

 ¶1 Before expert testimony is admitted into evidence, a
 trial court must find that it is both reliable and relevant.
Only the relevance requirement is before us today. To
 determine whether expert testimony is relevant, a trial court
 must consider the testimony's helpfulness to the jury,
 which hinges on whether the testimony "fits" the
 facts of the particular case. But just how close a fit is
 required? The questions we agreed to review in this case and
 the lead companion case of People v. Cooper, 2021 CO
 69, __P.3d__, call upon us to explore the fit requirement in
 the context of generalized expert testimony (i.e.,
 testimony aimed at educating the jury about general concepts
 or principles without attempting to discuss the particular
 facts of the case).[1]

 ¶2
We now hold that generalized expert testimony fits a case if
 it has a sufficient logical connection to the factual issues
 to be helpful to the jury while still clearing the
 ever-present CRE 403 admissibility bar. In evaluating the fit
 of generalized expert testimony, a trial court must be
 mindful of the purposes for which such testimony is
 offered-that is, the reasons why the proponent of the
 evidence has asked the expert to educate the jury about
 certain concepts or principles.

 ¶3 The trial court in this case admitted the generalized
 expert testimony offered by the People on the dynamics of
 domestic violence, ruling that it would be helpful to the
 jury and impliedly finding that it passed muster under CRE
 403. A jury then returned guilty verdicts against the
 defendant, Dylan Thomas Coons, for sexual assault, extortion
 (involving an unlawful act), extortion (involving a third
 party), and assault in the third degree. But a division of
 the court of appeals reversed the judgment of conviction,
 concluding that some of the People's generalized expert
 testimony did not fit the case. More specifically, the
 division ruled that the trial court abused its discretion in
 admitting expert testimony about some aspects of the Power
 and Control Wheel (a tool adopted by social scientists to
 explain the common dynamics of domestic violence), including
 "certain of the examples of abusive acts that abusers
 may commit." People v. Coons, No.
 15CA1922, ¶ 45 (May 23, 2019). According to the
 division, since this testimony had no logical relation to the
 facts of the case, it should have been excluded and the trial
 court's failure to do so was reversible error.

 ¶4
 As we explain in Cooper, however, while generalized
 expert testimony must fit the case, the fit need not be
 perfect. Cooper, ¶¶ 5, 53. In other words,
 each aspect of such testimony need not match a factual issue.
Id. Since generalized expert testimony, by
 definition, seeks to inform the jury about generic concepts
 or principles without knowledge of the facts, it is almost
 inevitable that parts of such testimony will not be logically
 connected to the case. Id. For that reason, the fit
 inquiry must be flexible. Id. A trial court should
 certainly not be expected to parse the proposed testimony and
 determine whether each statement the expert intends to utter
 is logically connected to a fact in the case. Id. If
 the generalized expert testimony's logical connection to
 the factual issues is sufficient to be helpful to the jury
 without running afoul of CRE 403, the testimony fits the
 case. Id.

 ¶5
 Still, attorneys and trial courts should do their best to
 avoid introducing generalized expert testimony that has no
 logical connection to the facts of the case. Id. at
 ¶¶ 6, 54. As relevant here, prosecutors should take
 care to endorse generalized expert testimony about domestic
 violence only in appropriate cases; and, when they do so,
 they should endeavor to present only testimony that is
 logically connected to the factual issues. Id. Trial
 courts, in turn, should exercise their discretion in deciding
 whether to permit all, some, or none of the proffered
 testimony under the fit standard we articulate today.
Id. In doing so, trial courts should consider the
 feasibility and propriety of admitting only a portion of the
 proposed generalized expert testimony on a particular
 subject. Id.

 ¶6
 As in Cooper, we recognize in this case that some
 aspects of the expert's testimony about the Power and
 Control Wheel had no logical connection to the factual
 issues. See id. at ¶ 84. But, consistent with
 Cooper, we rule that it would have been infeasible
 and improper to require the expert to present an incomplete
 (and arguably inaccurate and misleading) version of the Power
 and Control Wheel. See id. at ¶¶ 86-87.

 ¶
 7 Because the court of appeals employed a fit standard
 that's inflexible and overly exacting, and because the
 trial court's decision to admit the challenged evidence
 was entitled to deference, the division erred. See
id. at ¶ 4. Applying the correct fit standard and
 affording the trial court's decision its due deference,
 we conclude that the admission of the generalized expert
 testimony in question did not constitute an abuse of
 discretion. We therefore reverse the judgment of the court of
 appeals and remand for further proceedings consistent with
 this opinion.

 I.
Facts

 ¶8
 The victim, K.J., met Coons when they were in high school;
 she was a freshman, and he was a senior. The day after K.J.
 turned fifteen, they began a sexual relationship. She
 initially performed oral sex on Coons, but a few months
 later, he started caning her during their sexual encounters.
Coons subsequently used a shock collar on K.J. She didn't
 like the shock collar, but Coons told her that if she liked
 him, she would agree to it. Coons also tied up K.J. and
 suspended her from ropes.

¶9 According to K.J., she was very shy and thought of
 herself as a "loser." She explained that nobody had
 ever been interested in her before and that it was "nice
 having someone older interested in [her] who was good looking
 [and] nice."

 ¶10 Coons eventually shared with K.J. that his
 girlfriend, Leanna Rutledge, knew about their sexual
 relationship. At Coons's suggestion, Rutledge became
 involved in the relationship during K.J.'s junior year.
In the trio's first sexual session, K.J. performed oral
 sex on Coons while Rutledge caned her. On other occasions,
 K.J. performed sexual acts on Rutledge.

 ¶11
 During K.J.'s senior year, she began having vaginal and
 anal sex with Coons. Coons and Rutledge got engaged around
 this time.

 ¶12
 While K.J. was in high school, she never told anyone about
 her sexual relationship with Coons and Rutledge, and the
 relationship was never public knowledge. K.J. was afraid that
 her family and friends would be disappointed in her and would
 stop speaking with her if they found out about the sexual
 relationship.

 ¶13
 In the summer after K.J.'s high school graduation, Coons
 and Rutledge sought to take sexually explicit photographs of
 her. K.J. was hesitant, fearing that the pictures could
 become public. But she ultimately allowed Rutledge to
 photograph her.

 ¶14
 As K.J. prepared to go away to college, she told Coons and
 Rutledge that she wanted a break from them. Coons and
 Rutledge didn't take the news well and began threatening
 to send the sexually explicit photographs to K.J.'s
 family and friends and to post them on Facebook. These
 threats continued after K.J. started attending college in the
 fall of 2013. One day, Coons and Rutledge unexpectedly showed
 up on campus. K.J. told them she had to study, and that
 rejection, combined with her failure to visit them after
 starting college, upset them.

 ¶15
 K.J. participated in the Reserve Officer Training Corps
 ("ROTC") in her first college semester. Upon
 learning about K.J.'s involvement in ROTC, Coons
 threatened to release the photographs to her ROTC captain and
 the school's administration. K.J. eventually quit ROTC
 because she was worried about the disclosure of the
 photographs. She was convinced that if the pictures became
 public, she would be kicked out of school. K.J. was also
 afraid that dissemination of the pictures would cause her
 family to stop supporting her financially and would adversely
 affect her employment prospects.

 ¶16
 The threats from Coons to publish the photographs persisted
 into the spring of 2014 (K.J.'s second college semester).
K.J. told Coons that she didn't like his threats. But
 Coons told her that she was "not giving [him] a
 choice" and that she knew "how to fix things"
 between them. He asked her, "[W]hy keep fighting
 it?" ¶17 Coons often used the term
 "blackmail" when referring to his threats to
 disclose the photographs. For example, he blamed K.J. for not
 "fix[ing] things earlier" and said that she
"would have gotten [her] pictures" and "the
 blackmail would have stopped" already had she done what
 he wanted. And, on at least one occasion, he apologized for
 "blackmailing" her.

 ¶18 At some point during K.J.'s second semester,
 Coons told her that he had deleted the photos. K.J. responded
 that it was the right thing to do because the "blackmail
 was awful." Coons said that he was "truly
 sorry" and asked for her forgiveness, and she, in turn,
 forgave him but told him that things needed to be different
 going forward. K.J. mentioned that if she found someone with
 whom she wanted a relationship, Coons and Rutledge would have
 to understand and accept it. She added that they could not
 continue to prevent her from seeing other people and engaging
 in new relationships. Coons purportedly agreed.

 ¶19
 But shortly after that, in April 2014, Coons again repeatedly
 threatened to disclose the photographs. He faulted K.J. for
 not having made things right.

 ¶20
 A couple of months later, in June 2014, Coons asked K.J. to
 sign a contract he drafted. Under the contract, K.J. would
 agree to "not lie, to show emotion, to spend the night,
 [and] to use nicknames." For their part, Coons and
 Rutledge would agree to "not threaten" K.J. and
 "to never tell anybody" about their sexual
 relationship with her. K.J. realized that the contract
 required her to do "[a]nything they wanted" when
 she spent the night with them. She nevertheless signed the
 contract to end the blackmail. Almost immediately after it
 was signed, though, Coons accused her of breaking it by not
 using nicknames enough.

 ¶21
 In the summer of 2014, while K.J. was on break from school,
 she had a sexual encounter with Coons and Rutledge. She did
 not remember the specifics of this incident because she got
 drunk to "numb the pain a little bit."

 ¶22
 There was a second sexual encounter during the summer of
 2014, this time in Rutledge's mother's house. After
 drinking for a while, Coons, Rutledge, and K.J. went to the
 basement, where K.J. got undressed and was tied to a pool
 table with a rope. K.J. then performed oral sex on Coons
 while Rutledge used a vibrator on her. Eventually, Coons and
 Rutledge went upstairs, leaving K.J. tied to the table with
 the vibrator on her labia. They didn't return and untie
 her until approximately twenty-five minutes later. When Coons
 and Rutledge sought to use the vibrator on K.J. again, she
 refused. In response, Coons repeatedly hit her in the
 "crotch." The evening ended with Coons, Rutledge,
 and K.J. falling asleep on a couch upstairs while watching a
 movie.

 ¶23
 Early the next morning, Coons woke K.J. up and asked her to
 go downstairs. He wanted to have sex with her, but she
 declined. He then shared that he had taken additional
 photographs of her the night before without her knowledge and
 that he would disclose them if she didn't do as he
 requested. K.J. acquiesced to having sex with him so that the
 new photographs would not be disclosed. After having sex,
 Coons and K.J. went back upstairs and fell asleep.

 ¶24 K.J. felt awful after this incident because she had
 just "been sexually assaulted, . . . had bruises, . . .
 hurt everywhere, and . . . didn't want to do this
 anymore." She thus texted Coons that she was "never
 doing that again" and that the relationship was
 "done" and "broken." Coons texted back
 and informed her that he was on his way to the hospital.
Rutledge then texted K.J.: "What the hell, you killed
 him." K.J. replied: "He said he wouldn't do it
 again but he did, and he threatened me until I did what he
 wanted. I hope he is okay."

 ¶25
 Rutledge and K.J. exchanged additional texts about Coons, who
 was having heart problems. In her texts, Rutledge again
 blamed K.J. for Coons's medical condition. She also
 pressured K.J. to acknowledge that they were all adults and
 that Coons had not hurt or forced anyone to do anything. But
 K.J. wouldn't take the bait:

[Coons] apparently took a [new] photo of me and then told me
 downstairs he was going to send it to my parents if I
 didn't do what he wanted. And it was in the morning and
 you weren't there. And I did not consent to being
 repeatedly slapped in the crotch. He still blackmailed [me]
 before that point.

Rutledge replied: "Leave us alone, then, if that night
 was that bad, K?" She later asked K.J. to imagine how
 Coons would feel if he found out that K.J. had breached the
 contract and wanted out of the relationship.

 ¶26
 In a subsequent text, Rutledge was critical of K.J. for not
 visiting Coons in the hospital. When K.J. repeated that Coons
 had blackmailed her and that it was "bad," Rutledge
 didn't react kindly: "Wow. Bye. You're a liar
 and really don't care. He may threaten you, but you
 killed him. Leave me alone. I trusted you and loved
 you."

 ¶27
 After K.J. returned to school for her sophomore year, she had
 the following text conversation with Coons:

K.J.: Why is being able to say no a big deal?

Coons: Do you want to fix things or not?

K.J.: Can you not call me with my roommate in the room? And
 do you want to give what I asked for?

Coons: No.

K.J.: Why?

Coons: Because if I'm putting my heart on the line, you
 have to trust us.

K.J.: You didn't stop when I said no.

Coons: K.

K.J.: So I don't get to be treated like a person?

Coons: No. You just have to trust us. And after class call
 me.

 ¶28
 K.J. then spoke with Coons on the phone. A school employee
 became concerned after overhearing part of the conversation
 and observing that K.J. was upset. Although K.J. told the
 employee that she was fine, the employee later emailed her to
 see if everything was okay and to ensure that K.J. knew about
 resources the school could offer her. The employee eventually
 convinced K.J. to open up, and K.J. shared what had been
 taking place. The matter was then referred to a law
 enforcement agency, which collected information that K.J. had
 stored on her cell phone-text and voicemail messages from
 Coons and Rutledge, as well as photographs that K.J. had
 taken of her injuries.

 II.
Procedural History

 ¶29
 Coons was charged with sexual assault, two counts of criminal
 extortion (each alleging a different method of committing the
 crime of extortion), and third degree assault. The People
 further asserted that the facts forming the basis of each
 charge met the statutory definition of domestic violence in
 Colorado. See § 18-6-800.3(1), C.R.S. (2020)
("'Domestic violence' means an act or threatened
 act of violence upon a person with whom the actor is or has
 been involved in an intimate relationship," as well as
 "any other crime against a person, or against property .
 . . when used as a method of coercion, control, punishment,
 intimidation, or revenge directed against a person with whom
 the actor is or has been involved in an intimate
 relationship.").[2]

 ¶30 Before trial, the People provided notice of their
 intent to introduce generalized expert testimony regarding
 domestic violence through Erica Laue, who was employed at
 TESSA (a domestic violence and sexual assault response
 organization) and had worked as a counselor and victim
 advocate for more than a decade. Coons objected on the ground
 that Laue didn't "know anything about this
 case" and was going to speak in "generalities in
 hopes of prejudicing the jury" against him. The trial
 court noted that it wasn't aware of "a requirement
 for expert witnesses to have been specifically involved with
 the parties to the suit" and that this wasn't the
 first time generalized expert testimony was being introduced
 to address "how a typical person in a situation reacts
 to certain things."

 ¶31
 On the morning of trial, Coons again opposed Laue's
 expert testimony, this time arguing that it was irrelevant
 because there was no "allegation of violence"
 between Coons and K.J. before the charged conduct. The
 "basic stuff about domestic violence and the cycle of
 violence," maintained Coons, just didn't "apply
 to this particular case." Further, consistent with his
 theory of defense, Coons contended that any acts between him
 and K.J., including the alleged sexual assault, were
 consensual, and that his threats were empty and not meant to
 be taken seriously.

 ¶32
The People countered that they had alleged that the acts
 supporting all of the charges were acts of "domestic
 violence," that they had to prove each such allegation
 (a burden they anticipated would be very difficult to satisfy
 without Laue's expert opinions about "how these
 things work and what domestic violence entails"), that
 domestic violence was intertwined "throughout this
 entire case," and that the jury would have to
 "properly contextualize" the events in question. As
 further support for their request to introduce Laue's
 generalized expert testimony, the People maintained that: (1)
 the relationship between Coons and K.J. had spanned several
 years and included "a substantial amount of manipulation
 and control . . . by [Coons] over [K.J.]"; (2) K.J. had
 been repeatedly coerced and blackmailed by Coons, including
 through threats to disclose "the most intimate details
 of her sexual history, as well as pictures of sexual acts . .
 . unless she did what [Coons] said"; and (3) the jury
 needed to understand that when a person commits domestic
 violence, he "is not always mean, cruel, or
 vindictive" and is often "polite,"
"nice," and willing to "go back,"
"make up," and engage in
 "reconciliation."

 ¶33
 After considering the parties' arguments, the trial court
 allowed Laue's proposed generalized expert testimony. It
 concluded that such testimony would be helpful to the jury
 "in light of the nature of the charges and the
 statements of counsel as far as what type of evidence will be
 solicited." And the court impliedly found that the
 evidence cleared the CRE 403 admissibility bar.

 ¶34 On direct examination, Laue was qualified as an
 expert witness in the dynamics of domestic violence. She
 testified about "power and control" being the
 defining characteristic of domestic violence. To educate the
 jury regarding that overarching concept, she used the Power
 and Control Wheel, a "widely accepted tool"
 developed by social scientists to explain the common
 "dynamics of domestic violence." Jane K. Stoever,
 Transforming Domestic Violence Representation, 101
 Ky. L.J. 483, 511 (2013).

 ¶35
 Laue explained that, while people have historically thought
 of domestic violence as purely physical violence, the Power
 and Control Wheel illustrates "that physical violence is
 only one component of a domestic violence situation."
Consequently, said Laue, although physical violence may occur
 in an abusive intimate relationship, "what makes an
 abusive relationship abusive" is the "power and
 control" that a person exerts over his or her intimate
 partner. Laue added that the eight different spokes of the
 Power and Control Wheel represent the nonphysical forms of
 abuse through which power and control are typically exerted
 in an intimate relationship: (1) coercion and threats; (2)
 intimidation; (3) emotional abuse; (4) isolation; (5) making
 light of the abuse, denying it happened, and blaming the
 victim for it; (6) using children; (7) male privilege; and
 (8) economic abuse.

 ¶36 The Power and Control Wheel, which we reproduce
 below, prominently features the words "Power and
 Control" in the hub, refers to physical and sexual
 violence along the top and bottom peripheries, and includes
 the eight aforementioned spokes:[3]

 (Image
 Omitted)

 ¶37 In discussing each of the spokes of the Power and
 Control Wheel, Laue provided examples of the behaviors listed
 within each spoke. She did so to highlight for the jury
 "how somebody might use . . . different social dynamics
 and different interpersonal and relational dynamics to exert
 power and control" in an intimate relationship.

 ¶38 The jury returned guilty verdicts on all the
 charges. It also rendered a separate "domestic
 violence" finding for the acts underlying each charge.

 ¶39
 Coons appealed, and a division of the court of appeals
 reversed. The division acknowledged that much of Laue's
 testimony was relevant "to explaining the dynamics of
 the relationship between Coons and [K.J.] and the behavior of
 Coons and [K.J.] during their relationship."
Coons, ¶ 45. But the division viewed most of
 the spokes on the Power and Control Wheel as logically
 unrelated to the facts of this case. Id. In this
 regard, it deemed irrelevant the testimony about "the
 various acts of abuse not involving [the] coercion [and]
 threats [spoke]," including threats or attempts to harm
 "the victim's pets" or to abuse "the
 victim's children." Id. And within the
 coercion and threats spoke, the division identified threats
 or attempts to kill the victim as acts of abuse lacking
 relevance in this case. Id. The division noted that
 these aspects of Laue's testimony "did not fit"
this case because there was no allegation by the People that
 Coons tried or threatened to kill K.J. or tried or threatened
 to kill or harm any child or pet she may have had.
Id. Therefore, concluded the division, the trial
 court should have excluded those portions of Laue's
 testimony, and its failure to do so was an abuse of
 discretion that constituted reversible error.[4] Id. at
 ¶¶ 45-46.

 ¶40
The People then filed a petition for certiorari. We granted
 the People's petition in part.[5]

 III.
Standard of Review

 ¶41
"We review a trial court's admission of expert
 testimony for an abuse of discretion and will reverse only
 when that decision is manifestly erroneous." People
 v. Rector, 248 P.3d 1196, 1200 (Colo. 2011). This is a
 deferential standard that reflects the superior opportunity a
 trial court has to assess both the competence of an expert
 witness and whether her opinions will be helpful to the jury.
Id.

 IV. Analysis

 ¶42
 Guided by Cooper, we hold that generalized expert
 testimony fits a case if it has a sufficient logical
 connection to the factual issues to be helpful to the jury
 while still clearing the ever-present CRE 403 admissibility
 bar. Cooper, ¶ 3. In evaluating the fit of
 generalized expert testimony, a trial court must be mindful
 of the purposes for which such testimony is offered-that is,
 the reasons why the proponent of the evidence has asked the
 expert to educate the jury about certain concepts or
 principles. Id.

 ¶43
 While generalized expert testimony must fit the case, the fit
 need not be perfect. Id. at ¶¶ 5, 53. In
 other words, each aspect of such testimony need not match a
 factual issue. Id. Since generalized expert
 testimony, by definition, seeks to inform the jury about
 generic concepts or principles without knowledge of the
 facts, it is almost inevitable that parts of such testimony
 will not be logically connected to the case. Id. For
 that reason, the fit inquiry must be flexible. Id. A
 trial court should certainly not be expected to parse the
 proposed testimony and determine whether each statement the
 expert intends to utter is logically connected to a fact in
 the case. Id. If the generalized expert
 testimony's logical connection to the factual issues is
 sufficient to be helpful to the jury without running afoul of
 CRE 403, the testimony fits the case. Id.

 ¶44 Still, attorneys and trial courts should do their
 best to avoid introducing generalized expert testimony that
 has no logical connection to the facts of the case.
Id. at ¶¶ 6, 54. As relevant here,
 prosecutors should take care to endorse generalized expert
 testimony about domestic violence only in appropriate cases;
 and, when they do so, they should endeavor to present only
 testimony that is logically connected to the factual issues.
Id. Trial courts, in turn, should exercise their
 discretion in deciding whether to permit all, some, or none
 of the proffered testimony under the fit standard we
 articulate today. Id. In doing so, trial courts
 should consider the feasibility and propriety of admitting
 only a portion of the proposed generalized expert testimony
 on a particular subject. Id.

 ¶45
 So, did the trial court abuse its discretion in allowing all
 of Laue's generalized expert testimony on abusive
 intimate relationships? The division held that it did. But we
 beg to differ.

 ¶46
We don't have a bone to pick with the division's
 determination that parts of Laue's testimony had no
 logical relation to the facts of this case. Indeed, the
 division correctly observed that there was no allegation that
 Coons attempted or threatened to kill the victim or attempted
 or threatened to kill or harm a pet or a child.
Coons, ¶ 45. Yet Laue mentioned all of those
 behaviors as examples of some of the nonphysical forms of
 abuse set out in the Power and Control Wheel. The question is
 whether the lack of a logical connection between certain
 parts of Laue's testimony and the facts of this case
 rendered that testimony inadmissible. The division answered
 in the affirmative and ruled that the trial court abused its
 discretion and committed reversible error in failing to
 exclude such testimony. We answer in the negative and
 conclude that the division applied an overly arduous fit
 standard that lacked pliability. See Cooper, ¶
 4.

 ¶47
 But we must "[b]egin at the beginning." Lewis
 Carroll, Alice's Adventures in Wonderland 142
 (Edmund R. Brown ed., International Pocket Library 1865). So,
 we first note our wholehearted agreement with the
 division's conclusion that "much" of Laue's
 generalized expert testimony was both logically connected to
 the facts of this case and admissible under CRE 403.
Coons, ¶ 45. As the division acknowledged, Laue
 educated the jury about the characteristics of an abusive
 intimate relationship like the one between Coons and K.J.
 Id.

 ¶48
 The division next correctly recognized that Laue's
 testimony regarding the power-and-control dynamic helped
 explain to the jury "the behavior of Coons and
 [K.J.]" throughout their relationship. Id. But
 the division didn't do justice to the logical connection
 between Laue's testimony and the behaviors exhibited by
 Coons and K.J.

 ¶49
 With respect to Coons's behavior, the division undersold
 Laue's testimony. While her opinions regarding
 "coercion and threats" did, indeed, fit the facts
 of this case, see id., so did her opinions
 regarding: intimidation; emotional abuse; isolation; economic
 abuse; male privilege; and making light of the abuse, denying
 it happened, and blaming the victim for it. Thus, contrary to
 the division's impression, Laue's testimony about
 seven of the eight spokes on the Power and Control Wheel-not
 just her testimony about the "coercion and threats"
 spoke- was logically related to the facts of this case.

 ¶50
The People introduced evidence that Coons had repeatedly
 intimidated K.J. through his actions and
 communications; that he had emotionally abused her
 by putting her down and making her feel both guilty and bad
 about herself; that he had isolated her by limiting
 who she saw; that he had economically abused her by
 threatening to jeopardize her parents' financial support
 and her employment prospects; that he had displayed a sense
 of male privilege by treating her like his servant;
 and that he had minimized, denied, and blamed by
 making light of the abuse, refusing to take her concerns
 seriously, and shifting responsibility for the abuse to her.
Of the eight spokes, the only one that Laue addressed that
 didn't match a fact in this case was the "using
 children" spoke.[6]

 ¶51 Separate and apart from the Power and Control Wheel,
 there was another aspect of Coons's behavior about which
 Laue educated the jury. Laue disabused the jurors of any
 belief they may have had about domestic violence perpetrators
 always being mean, cruel, and vindictive. She explained that
 abusers are often kind and willing to reconcile after a
 disagreement. This testimony, too, was logically related to
 the facts of this case because Coons had at times been caring
 and had demonstrated a willingness to reconcile with
 K.J.[7]

 ¶52
 With respect to K.J.'s behavior, the division didn't
 go into specifics. But the devil is in the details. Coons
 attacked K.J.'s credibility at trial based on her delayed
 outcry and the fact that she kept returning to her
 relationship with Coons. Laue's opinions put these
 criticisms in context for the jury. See Cooper,
 ¶¶ 66-76. The People were entitled to rely on
 generalized expert testimony to counter any false assumptions
 and antiquated notions that may have led some jurors to view
 K.J.'s behavior as counterintuitive. See id.

 ¶53
 Returning to the linchpin of the division's decision, we
 again recognize that certain facets of Laue's testimony
 on the Power and Control Wheel had no logical relation to
 this case-namely, her discussion of the "using
 children" spoke and her comments regarding threats or
 attempts to harm someone or a pet. However, the admission of
 those statements does not constitute error, let alone
 reversible error. As we explain in more detail in
 Cooper, it is virtually inevitable that some
 generalized expert testimony about the dynamics of abusive
 intimate relationships will fall short of matching a fact in
 a particular domestic violence case. Id. at
 ¶¶ 5, 53, 85. Indeed, the point of generalized
 expert testimony is to educate the jury about
 generic concepts and principles without regard for
 the specific facts of the case. Id. It follows that
 there will almost always be some testimony that has no
 logical relation to the facts of the case. Id. at
 ¶ 85. To require a perfect match between generalized
 expert testimony and the facts of a case would be to
 transform such testimony into case-specific testimony.
Id. at ¶¶ 85, 87.

 ¶54
 In Cooper, we conclude that it was feasible and
 proper for the trial court to limit the generalized expert
 testimony of the People's expert, Janet Kerr, regarding a
 victim's counterintuitive behaviors by excluding the
 proffered opinions on recantation, minimization, and lack of
 cooperation. Id. at ¶¶ 57, 87. Because the
 victim there had not recanted, minimized, or failed to
 cooperate, such testimony had no logical connection to the
 factual issues. Id. at ¶ 57. We hasten to add
 in Cooper, though, that "it would have been
 infeasible and improper to similarly restrict [Kerr's]
 testimony on the Power and Control Wheel" by requiring
 her to omit mention of some of its spokes:

The division's approach would have required the
 prosecutor to tell Kerr which spokes of the Power and Control
 Wheel matched the facts of this case. It then would have
 required Kerr to recast, on the fly, the Power and Control
 Wheel into something that social science has neither studied
 nor approved. And it ultimately would have required Kerr to
 share with the jury an incomplete (and arguably inaccurate
 and misleading) version of the Power and Control Wheel.

Id. at ¶¶ 86-87.

 ¶55
 The division nevertheless surmised that there was "a
 reasonable probability that the jury could have
 considered" the parts of Laue's testimony that
 lacked a logical connection to the facts of this case as
 "predictive of Coons's future behavior."
Coons, ¶ 48. Continuing, the division observed
 that such testimony went hand in glove with Laue's
 opinions that domestic violence is typically cyclical and
 often increases in severity, and that victims of domestic
 violence are frequently unable (or unwilling) to escape.
Id. In the division's view, there was a
 "reasonable probability that, if the cycle of domestic
 violence" between Coons and K.J. persisted,
 "Coons's abuse would increase in severity and Coons
 would begin to do things such as threatening to kill the
 victim." Id. The division ultimately reversed
 Coons's judgment of conviction because it believed that
 the guilty verdicts could have been based, at least in part,
 on the jury's desire "to break the cycle of
 abuse" between Coons and K.J. before Coons began to
 abuse her "in the other ways described" by Laue.
Id. Though we appreciate the division's concern,
 we reject its conclusion for three reasons.

 ¶56
 First, there is no basis in the record to believe that the
 jury drew improper inferences from Laue's testimony, and
 we can't assume that unfounded considerations influenced
 the verdicts. The prosecutor made crystal clear that Laue was
 simply sharing general background information about certain
 concepts and principles related to domestic violence. Laue
 herself told the jury, in no uncertain terms, that she had no
 knowledge of any of the facts of this case, had not
 interviewed Coons or K.J., and was not opining about the
 veracity of K.J.'s version of events, much less about
 whether Coons was guilty or not guilty. There is no reason to
 think that the jury was confused and unable to distinguish
 between the case-specific factual testimony and Laue's
 generalized expert testimony.

 ¶57
 Moreover, at the end of the trial, the court instructed the
 jurors that they were not bound by Laue's testimony and
 that it was up to them to decide whether to believe all of
 that testimony, some of it, or none of it. Thus, having been
 told that Laue knew nothing about this case and was simply
 providing general background information about domestic
 violence, the jurors were then advised that, in any event, it
 was their prerogative to decide whether to accept or
 disregard her opinions in whole or in part. The jurors were
 also directed to: assess the credibility of the witnesses
 (including the factual witnesses); base their verdicts on the
 evidence introduced at trial and not on speculation; and
 guard against being influenced by sympathy, bias, or
 prejudice. We, of course, must "presume that a jury
 follows the trial court's instructions and would acquit .
 . . if the prosecution did not prove all of the elements of
 the . . . charge beyond a reasonable doubt." Galvan
 v. People, 2020 CO 82, ¶ 29, 476 P.3d 746, 755
(omissions in original) (quoting People v. Trujillo,
 83 P.3d 642, 648 (Colo. 2004)).

 ¶58
 Second, the division failed to consider the infeasibility and
 impropriety of introducing a partial Power and Control Wheel.
Relatedly, the division overestimated the risk that
 Laue's testimony unfairly prejudiced Coons given that
 seven of the eight spokes of the Power and Control Wheel were
 logically connected to the facts of this case.

 ¶59
 Third, embracing the division's standard would risk
 rendering generalized expert testimony largely, if not
 wholly, inadmissible. Here, the division decided that a new
 trial was necessary because parts of Laue's testimony had
 no logical relation to this case and thus the jury may have
 assumed facts that were prejudicial to Coons. But such a
 standard essentially requires a perfect match between
 generalized expert testimony and the facts of a case, and
 we've already explained that it is almost impossible to
 have such a match in any particular case. Because parts of
 Laue's testimony did not match the facts of this case,
 the division ruled that the trial court committed reversible
 error. In our opinion, however, throwing the baby out with
 the bathwater isn't the answer. Rather, to mitigate the
 valid concerns identified by the division, a trial court
 should: (1) make clear for the jury the scope of the
 generalized expert testimony; (2) afford the defendant an
 opportunity for vigorous cross-examination of the expert; (3)
 allow the defendant to present contrary evidence; (4) provide
 appropriate jury instructions; and (5) apply CRE 403. See
Cooper, ¶¶ 90-93. The trial court employed all
 these mechanisms.

 ¶60
 Notably, we infer from the record that the trial court
 applied CRE 403 and found that the probative value of
 Laue's testimony was not substantially outweighed by the
 risk of confusing or misleading the jury. While we understand
 the need for trial courts to guard against the potential for
 expert evidence confusing or misleading the jury, we conclude
 that the division in this case failed to give the trial
 court's admissibility decision the deference it deserved.
When reviewing a determination regarding the admission of
 expert testimony, our task as appellate courts is to check
 for an abuse of discretion, not to substitute our judgment
 for the trial court's. Here, we perceive no abuse of
 discretion by the trial court.

 V.
Conclusion

 ¶61
We reiterate that generalized expert testimony, like that
 provided by Laue in this case, is not automatically
 admissible in domestic violence trials-the testimony must fit
 the facts of the case. Today we clarify that the fit
 requirement means that generalized expert testimony must have
 a sufficient logical connection to the facts of the case to
 be helpful to the jury while still clearing the ever-present
 CRE 403 bar. Prosecutors should take care to endorse
 generalized expert testimony about domestic violence only in
 appropriate cases; and, when they do so, they should endeavor
 to present only testimony that is logically connected to the
 factual issues. Trial courts, in turn, should exercise their
 discretion in deciding whether to permit all, some, or none
 of the proffered testimony under the fit standard we
 articulate today. In doing so, trial courts should consider
 the feasibility and propriety of admitting only a portion of
 the proposed generalized expert testimony on a particular
 subject.

 ¶62
 Inasmuch as the division mistakenly concluded that the trial
 court committed reversible error in allowing Laue to provide
 certain generalized expert testimony regarding domestic
 violence, we reverse. We remand for further proceedings
 consistent with this opinion.

 JUSTICE GABRIEL concurs in the judgment, and JUSTICE HOOD and
 JUSTICE HART join in the concurrence in the judgment.

 JUSTICE GABRIEL, concurring in the judgment.

 ¶63
 For the reasons set forth in my dissenting opinion in
 People v. Cooper, 2021 CO 69, ¶¶ 100-41,
 __P.3d__ (Gabriel, J., dissenting), which the court is also
 announcing today, I do not agree with the new test that the
 majority announces, namely, that generalized expert testimony
 fits a case if it has a sufficient logical connection to the
 factual issues to be helpful to the jury while still clearing
 the ever-present CRE 403 admissibility bar. Maj. op.
 ¶¶ 2, 42, 61. Nor do I agree that it would have
 been "infeasible and improper," id. at
 ¶ 6, to require the People's expert, Erica Laue, to
 omit mention of the clearly irrelevant spokes of the
 so-called "Power and Control Wheel," see
Cooper, ¶ 128 (Gabriel, J., dissenting)
(disagreeing with the majority's statement that it was
 "impossible" for the domestic violence expert in
 that case to discuss the Power and Control Wheel without
 referring to matter that was not logically related to the
 facts of the case). It is certainly appropriate for a trial
 court to omit testimony regarding portions of the Power and
 Control Wheel that have no relevance to the case before it.
Moreover, I would continue to follow the test set forth in
 People v. Martinez, 74 P.3d 316, 323 (Colo. 2003),
 where we explained:

Helpfulness to the jury hinges on whether the proffered
 testimony is relevant to the particular case: whether it
 "fits." Fit demands more than simple relevance; it
 requires that there be a logical relation between the
 proffered testimony and the factual issues involved in the
 litigation. That is, even if good grounds exist for the
 expert's opinion, it must be validly and scientifically
 related to the issues in the case. That particular expert
 testimony fits or is valid for one facet or purpose of a
 proceeding does not necessarily compel the conclusion that it
 fits all facets. Therefore, the admissibility of evidence
 must be evaluated in light of its offered purpose.

(Citations omitted.)

 ¶64
 That said, I do not believe that it was necessary for the
 majority to decide or apply either test in this case because,
 assuming without deciding that the trial court erred in
 admitting the generalized expert testimony at issue, any such
 error was harmless. The evidence of guilt in this case was
 overwhelming, with the evidence strongly tending to establish
 a cycle of domestic and emotional abuse, violence,
 intimidation, manipulation, control, and coercion. Moreover,
 I agree with the majority that the record does not support
 the division's surmise that the jury may have viewed
 Laue's testimony as predictive of defendant Dylan
 Coons's future behavior. Maj. op. ¶¶ 55-56.

 ¶65
 Accordingly, like the majority, I would reverse the judgment
 of the division below, but I would do so on far narrower
 grounds. I therefore concur in the judgment only.

 I am
 authorized to state that JUSTICE HOOD and JUSTICE HART join
 in this concurrence in the judgment.

---------

Notes:

[1] Perhaps taking a cue from the case
 law, the parties use the term "blind expert
 testimony." We prefer "generalized expert
 testimony."

[2] A person convicted of a crime, the
 underlying factual basis of which has been found to be an act
 of domestic violence, is subject to certain consequences.
See § 18-6-801, C.R.S. (2020).

[3] This graphic of the Power and Control
 Wheel is for illustrative purposes only. Though not a replica
 of the exhibit used at trial, it is substantively identical
 to it.

[4] Because principles of double jeopardy
 "would bar retrial if the evidence presented at trial
 was not sufficient to support the two extortion
 convictions," the division considered Coons's
 challenge to the sufficiency of the evidence regarding the
 two extortion counts. Coons, ¶ 1. After
 rejecting Coons's claim, the division declined to
 consider the merits of his objection to one of the jury
 instructions, which he raised for the first time on appeal.
Id. at ¶ 70.

[5] Here are the issues we agreed to
 review:

1. Whether the court of appeals erred in finding the
 entirety of a blind expert's testimony under CRE 702 must
 be limited to occurrences that are specifically tied to the
 particular facts of the case.

2. Whether the court of appeals erred in finding the
 admission of the expert testimony was not harmless.

[6] While seven spokes were logically
 related to this case, we've acknowledged that not all of
 the examples of abusive behaviors within those spokes had a
 logical connection to this case. For instance, as we
 mentioned earlier, Laue referenced pet abuse as an example of
 abusive behaviors within the intimidation spoke.

[7] Today's decision should not be
 understood as permitting generalized expert testimony on
 domestic violence whenever there is evidence that a defendant
 has been both kind and violent. As we make clear, this
 wasn't the only fact on which the trial court relied in
 finding that Laue's testimony fit this case.

---------