22CA1117 Peo v Young 11-21-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1117
Arapahoe County District Court No. 20CR1935
Honorable Ben L. Leutwyler III, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Samuel Alvin Young,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE LUM
Freyre and Grove, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 21, 2024

Philip J. Weiser, Attorney General, William G. Kozeliski, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee.

Megan A. Ring, Colorado State Public Defender, Leah Scaduto, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant.

¶ 1    Defendant, Samuel Alvin Young, appeals the judgment of conviction entered on a jury verdict finding him guilty of four counts of attempted manslaughter, one count of illegal discharge of a weapon, and two counts of second degree assault.  We affirm.

## I.    Background

¶ 2    In July 2020, the death of Elijah McClain sparked mass protests at the Aurora Municipal Center.  The protesters, followed by officers from the Aurora Police Department (APD), marched from the Municipal Center onto Interstate 225 (I-225).  Protesters and police officers had blocked off a portion of the interstate, keeping cars from traveling northbound on I-225.  To ensure that cars would not approach the protesters from behind, protesters parked their vehicles on the on-ramp and blocked the highway.

¶ 3    Kyle Faulkison, driving a blue Jeep, maneuvered past the makeshift barrier and onto the highway.  Sebastian Sassi — following behind protesters in a white pickup truck and concerned that the blue Jeep would hit someone — swerved his vehicle into the Jeep, causing a minor crash.  Despite the collision, Faulkison continued down the highway, although at a slower speed than before the contact with Sassi's vehicle.  Many protesters moved out

1

of Faulkison's path and to the side of the highway, while others threw objects at the Jeep to stop it.

¶ 4    Young was near the middle of the crowd of protesters on the highway when he fired five bullets at the passing Jeep. The shooting injured two protesters in the crowd but not Faulkison. At trial, the prosecution argued, and offered evidence showing, that sixteen seconds elapsed between the time Sassi swerved into the Jeep and the time Young started shooting.

¶ 5    The day after the shooting, Young called APD to identify himself and offered to speak with the police with an attorney. APD then issued an arrest warrant for Young. After charging Young, the prosecution proceeded to trial on four counts of attempted reckless manslaughter, two counts of first degree assault, and one count of illegal discharge of a firearm.

¶ 6    Young didn't testify, but his attorney argued that Young made a "split-second" decision to shoot at the Jeep in self-defense and defense of others. The central dispute at trial was the reasonableness of Young's belief that the Jeep posed an imminent threat to himself or the other protesters and his belief that the degree of force he used was necessary. After the close of evidence,

the jury was instructed on heat of passion and defense of others. Young was convicted of attempted manslaughter, illegal discharge of a weapon, and the lesser included offense of second degree assault (heat of passion). He was sentenced to five years of probation.

## II.    Right to Public Trial

¶ 7    Young contends that the trial court deprived him of his right to a public trial because it denied his request to provide his disabled mother with livestreaming access to the first day of the trial proceedings — resulting in a partial courtroom closure — without making express findings under *Waller v. Georgia*, 467 U.S. 39 (1984). We disagree.

### A.    Additional Facts

¶ 8    Before trial, Young requested that the court grant his mother permission to remotely observe the trial via a locked, password-protected Webex room. Young explained that his mother had multiple sclerosis and is a wheelchair user. Although the Arapahoe County District Court was wheelchair accessible, Young asserted that his mother's medical condition would have made it difficult or impossible for her to sit in a courtroom for an extended period of

time because she experiences "regular periods where she is unable to move" and suffers from "extreme stiffness and tightening of the muscles." Young also argued that, in light of his mother's "significant disability" and "high risk for COVID," she was entitled to accommodation under the Americans with Disabilities Act (ADA).

¶ 9 On the morning of the first day of trial, the court denied the request, stating that it did not plan to conduct any livestreaming of the trial and did not want to confer special privileges on Young's mother. The court added that since Young's mother was not a crime victim, she was not entitled to accommodations under the Victim Rights Act. The court also stated that granting the request would create a risk of interruption and improper recording of the proceedings.

¶ 10 That afternoon, Young again raised the issue of remote access and objected to the denial of his request, asserting a violation of his right to a public trial. The court ruled that its decision not to provide Young's mother with remote access did not constitute a courtroom closure and therefore did not implicate Young's public trial right. The court and the prosecutor noted for the record that members of the public and the media were present in the

4

courtroom. The court stated that the decision to be present in person at the trial was entirely up to Young's mother.

¶ 11   Young's mother was neither physically present nor able to remotely observe the first day of trial, which included jury selection and opening statements. On the afternoon of the first day of trial, Young's mother filed a motion under the ADA to allow her Webex viewing capability. The court referred her request to the district's ADA coordinator and later granted her motion. Young's mother had remote viewing access for the remainder of the trial.

## B.   Standard of Review

¶ 12   "Because a trial court's decision to close the courtroom presents a mixed question of law and fact, we review the court's legal conclusions de novo and its findings of fact for clear error." *People v. Turner*, 2022 CO 50, ¶ 19 (citations omitted). "When the trial court erroneously deprives the defendant of his public trial right, the error is structural in nature" and requires reversal. *People v. Hassen*, 2015 CO 49, ¶ 7.

## C.   Applicable Law

¶ 13   The United States and the Colorado Constitutions guarantee criminal defendants the right to a public trial. U.S. Const. amends.

VI, XIV; Colo. Const. art. II, § 16. "This right 'is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions.'" *People v. Jones*, 2020 CO 45, ¶ 16 (quoting *Waller*, 467 U.S. at 46). The public trial right furthers the following values: (1) "to ensure a fair trial"; (2) "to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions"; (3) "to encourage witnesses to come forward"; and (4) "to discourage perjury." *People v. Lujan*, 2020 CO 26, ¶ 28 (quoting *Peterson v Williams*, 85 F.3d 39, 42 (2d Cir. 1996)).

¶ 14 A total or partial closure of a courtroom can violate a defendant's right to a public trial. *Jones*, ¶ 27. The exclusion of even a single person can, under certain circumstances, constitute a partial closure that implicates the Sixth Amendment. *Id.* at ¶ 34.

### D. Analysis

¶ 15 The parties agree that there wasn't a total courtroom closure in this case. However, Young argues that the failure to initially provide his mother with remote access to the trial resulted in a

6

partial courtroom closure because she was unable to attend jury selection and opening statements. And because the trial court didn't justify its closure, Young contends that reversal is required. The People argue that no closure occurred, and if it did, the closure was trivial. *See Lujan*, ¶¶ 17, 24 (noting that an improper closure may be "so trivial as to not violate a defendant's public trial right"). We agree with the People's first argument and do not reach the second.

¶ 16 Two previous divisions of this court have concluded that the denial of, or technical difficulties with, remote access did not result in a partial closure when the courtroom was physically open to the public. *See People v. Gonzalez-Quezada*, 2023 COA 124M, ¶ 60 (holding that the exclusion of a single, intrusive, remote observer didn't violate the defendant's public trial right); *People v. Sloan*, 2024 COA 52M, ¶¶ 2, 18, 22 (holding that defendant's public trial right was not violated when the livestream experienced technical difficulties).

¶ 17 Conversely, divisions of this court have held that a courtroom closure occurs when certain spectators are excluded from attending a trial in person, even when Webex or other livestream access is

7

provided. For instance, in *People v. Bialas*, 2023 COA 50 (*cert. granted* Mar. 11, 2024), where the trial court physically excluded members of the public — including the defendant's family — from the courtroom but provided a livestream, a division of this court concluded that a partial closure warranting reversal had occurred. *Id.* at ¶ 15. Another division of this court determined that at least a partial closure occurred where the trial court restricted public access to the courtroom and instead created a Webex livestream which the public could observe remotely or in a designated room inside the courthouse. *People v. Roper*, 2024 COA 9, ¶¶ 7, 15 ("[W]e do not believe the Sixth Amendment permits an unfettered shift to televised, but otherwise closed, trial proceedings.").

¶ 18    We agree with the reasoning in *Gonzalez-Quezada* and *Sloan* and follow it here: because Young's courtroom remained open to the public, the trial court's denial of his request to provide his mother with remote access wasn't a partial courtroom closure. Likewise, we agree with *Bialas* and *Roper*: remote access without a physically open courtroom cannot fulfill a defendant's right to a public trial. Conversely, denial of remote access doesn't implicate the defendant's public trial right.

¶ 19    We reject Young's contention that his mother's purported inability to attend the trial due to her medical conditions compels a different outcome than *Gonzalez-Quezada* and *Sloan*. There are many reasons why attendance in person would be impracticable or impossible for members of a defendant's family (or other members of the public). For instance, an individual may be too ill to attend, live very far away, have an unavoidable scheduling conflict, or be unable to attend for financial reasons. We have found no case either before or after the remote access era holding that an otherwise open courtroom closes due to an individual's inability to attend trial for personal reasons. We decline to hold that a trial court is constitutionally required to make remote access available to anyone who — regardless of the reason why — cannot attend trial in person.

¶ 20    To the extent Young asserts that his mother was entitled to livestreaming access as a reasonable accommodation for her disability under the ADA, he doesn't cite, and we haven't found, any authority supporting the notion that a violation of his *mother's* statutory rights under the ADA resulted in a violation of *Young's* constitutional right to a public trial.

¶ 21   For these reasons, we conclude that the trial court didn't err by declining to provide Young's mother with remote viewing access for the first day of trial.

### III.   Expert Testimony

¶ 22   The trial court precluded expert testimony proffered by Young because it concluded that (1) the testimony was irrelevant; (2) the probative value of the testimony was substantially outweighed by its potential to confuse the issues; (3) the expert wasn't qualified; (4) the testimony would invade the province of the jury as to mens rea; and (5) the testimony wouldn't be helpful to the jury.  Young argues that all five bases for preclusion were erroneous.  Because we affirm the trial court's decision on the fifth basis (helpfulness), we need not examine the others.

### A.   Additional Facts

¶ 23   Before trial, Young endorsed David Kleiber as an expert in "Crime Scene Investigation & Shooting Incident Reconstruction, Force Science & Use of Force, Operability of firearms & Firearms training."  As relevant here, Young planned to call Kleiber to testify about the science of reaction times and the delay between a person's perception of danger (or the perception that danger has

passed) and the person's ability to initiate action or cease action in response to their perception. Kleiber's report referenced three studies on this topic relating to shooting reaction times in trained police officers, one of which indicated that police officers could take "up to 1.5 seconds to react to a cease fire stimulus."

¶ 24    Young argued that Kleiber's testimony was relevant to his self-defense claim and would help the jury to (1) understand that the "decision point" to start shooting was "when the Jeep was coming at him, first passed him"; (2) determine the "amount of control" he had to stop shooting once he had started; and (3) assess whether his decisions to start shooting or continue shooting were reasonable. The prosecution moved to exclude Kleiber's testimony, arguing that studies on police officers were inapplicable to Young because he didn't have law enforcement training.

¶ 25    The parties and the court questioned Kleiber during a pretrial hearing. At the hearing, Kleiber explained that:

- He would testify that "it takes time for an individual to identify a threat, to process information, and put that plan into action. And once that individual has put the

plan into action, it takes time to essentially reverse that as well."

- While the studies on shooting reaction time were on police officers, "the articles actually address . . . that there is a human component that deals with decision-making" and the ability to react to an identified threat.

- The level of firearms training among civilians was "all across the board," with some civilians having a higher level of training than law enforcement and some having "zero" training.

- There were "things out there" saying that "most individuals have a .25 to .30 [second] reaction time," but in his personal experience, reaction time is "a very individual-type thing."

- He based his reference to the .25 to .30 second reaction timeframe on a well-regarded firearms trainer, for whom .25 seconds was the "goal" reaction time.

- Whether a civilian has faster or slower reaction time than people with law enforcement training is "really very broadly based on . . . the individuals."

- An individual's reaction time is based on a number of factors, including training, experience, and immutable characteristics, and those factors could generate reaction times faster or slower than .25 to .30 seconds.

¶ 26    The court concluded that Kleiber's testimony wouldn't be helpful for the jury because the quantifications for reaction time contained in the articles were limited to trained law enforcement, and Kleiber would testify that a civilian might have a faster or slower reaction time.

B.    Standard of Review and Applicable Law

¶ 27    A trial court's decision about the admissibility of expert testimony is reviewed for abuse of discretion and will not be overturned unless it is "manifestly erroneous." *People v. Martinez*, 74 P.3d 316, 322 (Colo. 2003). This deference recognizes that the trial court has a "superior opportunity to determine . . . whether the expert's opinion will be helpful to the jury." *Id.*

¶ 28    CRE 702 provides that if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto." For expert testimony to be

13

admissible, "(1) the scientific principles underlying the testimony must be reasonably reliable; (2) the expert must be qualified to opine on such matters; (3) the expert testimony must be helpful to the jury; and (4) the evidence must satisfy CRE 403." *Martinez*, 74 P.3d at 322.

¶ 29 Helpfulness to a jury depends on how well the expert testimony "fits" a particular case. *Id.* at 323. "Fit demands more than simple relevance; it requires that there be a logical relation between the proffered testimony and the factual issues involved in the litigation." *Id.* The critical question a court must answer in assessing helpfulness is whether a jury can receive "appreciable help" from *this expert* on the subject at hand. *People v. Cooper*, 2021 CO 69, ¶ 48.

### C.   Analysis

¶ 30 The trial court didn't abuse its discretion by concluding that Kleiber's testimony would not have been helpful to the jury.

¶ 31 We reject Young's contention that the jury could have received "appreciable help," *id.*, from Kleiber's testimony about the basic premise that it takes some unquantified amount of time to react to

a particular situation. That concept is familiar to laypeople and doesn't require explanation from an expert.

¶ 32    Further, we agree with the trial court that Kleiber couldn't have provided any helpful information about how *much* time Young might have taken to react to a "fire" or "cease fire" stimulus. Any time quantifications Klieber may have been able to provide were — as the trial court correctly noted — based on studies conducted on trained police officers or on the "goal" reaction time for a firearms training program. Kleiber would have testified that any particular civilian's reaction time could be shorter or longer depending on their training. And even if there was, as Young argues, a broadly applicable "human component" to the time quantifications, Kleiber would also have had to admit that reaction time (1) depended on other, immutable individual characteristics and (2) was, in his experience, highly individualized.

¶ 33    In other words, Kleiber would have testified that reaction time delay could be .25 seconds, .30 seconds, 1.5 seconds, or shorter or longer than any of those times. While certainty isn't required, *see Kutzly v. People*, 2019 CO 55, ¶ 18, the trial court's conclusion that

such testimony wouldn't have been helpful isn't "manifestly erroneous." *Martinez*, 74 P.3d at 322.

## IV. Prosecutorial Misconduct

¶ 34 Young contends that the prosecutor committed misconduct in closing arguments by impermissibly commenting on his right not to testify at trial. We disagree.

### A. Applicable law and standard of review

¶ 35 Every person accused of a crime enjoys the constitutional right to remain silent. U.S. Const. amends. V, XIV; Colo. Const. art. II, § 18. "[A] prosecutor may not ask a jury to infer guilt from a defendant's constitutionally-protected right not to testify." *People v. Stevenson*, 228 P.3d 161, 171 (Colo. App. 2009).

¶ 36 However, a prosecutor may comment on the lack of evidence to support a defendant's contentions and may properly respond to the defendant's arguments. *People v. Gibson*, 203 P.3d 571, 577 (Colo. App. 2008); *People v. Vialpando*, 804 P.2d 219, 225 (Colo. App. 1990). "A prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn from those facts." *People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010).

¶ 37    Reviewing courts consider the following factors in determining whether a prosecutor's argument constituted an unconstitutional reference to a defendant's failure to testify at trial: (1) "[w]hether the comment referred specifically to the defendant's failure to take the stand or to rebut the evidence against him"; (2) "[w]hether the trial judge, after objection was made, gave a cautionary instruction to the jury to disregard the comments or the remarks relating to the failure of the accused to testify"; (3) "[w]hether the prosecutorial comments were aggravated or repetitive"; and (4) "[w]hether the defendant was the only person who could refute the evidence which caused the comments to be directly pointed at the accused." *People v. Todd*, 538 P.2d 433, 436 (Colo. 1975).

¶ 38    When references to a defendant's silence are not "intentionally designed to provoke adverse inferences of guilt in the minds of the jury," reversal is not required. *People v. Key*, 522 P.2d 719, 721 (Colo. 1974); *see also People v. Hall*, 107 P.3d 1073, 1078 (Colo. App. 2004) ("To determine whether a prosecutor's comment on the defendant's silence constitutes reversible error, the court should consider: (1) whether the improper remarks were used as a means of creating an inference of guilt; and (2) whether the prosecution

argued that the defendant's silence constituted an implied admission of guilt.").

¶ 39     Review of prosecutorial misconduct claims entails a two-step process.  We consider whether the prosecutor's arguments were improper and then whether any improper statement requires reversal under the applicable standard.  *People v. Carter*, 2015 COA 24M-2, ¶ 63.  To assess whether the prosecutor's comments were improper, a reviewing court must consider the totality of the circumstances, including "the language used, the context in which the statements were made, and the strength of the evidence supporting the conviction."  *Domingo-Gomez v. People*, 125 P.3d 1043, 1050 (Colo. 2005).

¶ 40     Because Young's arguments are unpreserved, review is limited to plain error.  *Id.* at 1053.  "Plain error occurs only when an error so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the jury's verdict."  *Id.*  "A reviewing court should examine alleged improper argument in the context of the prosecutor's closing argument as a whole.  The fact that the defendant did not object to the remarks may indicate his belief that the live argument was not overly damaging."  *People v.*

*Villa*, 240 P.3d 343, 356 (Colo. App. 2009). "Prosecutorial misconduct in closing argument rarely constitutes plain error." *Strock*, 252 P.3d at 1152-53. Only misconduct that is "flagrantly, glaringly, or tremendously improper" warrants reversal under the plain error standard. *Domingo–Gomez*, 125 P.3d at 1053 (quoting *People v. Avila*, 944 P.2d 673, 676 (Colo. App. 1997)).

### B. Analysis

¶ 41 Young challenges five of the prosecutor's comments during closing argument and rebuttal.

#### 1. "No Evidence" Comment

¶ 42 Young first challenges the following remarks:

> So first of all, you have no evidence of this
> defendant's state of mind or observations just
> prior to the shooting or during the shooting.
> There's no evidence in the record. Nobody can
> tell you what he saw or what he was thinking,
> and nobody did tell you that. And the
> instructions tell you [that] you cannot base
> your verdict on speculation, you can't guess as
> to what he might have saw [sic], guess as to
> what he might have thought. You can't do it.
> You can't speculate facts into existence that
> were not testified to during this trial.

¶ 43 We acknowledge that this comment represents a close call because it refers to a lack of evidence that only Young could

provide: evidence about his state of mind. *See Todd*, 538 P.2d at 436. Nevertheless, we conclude that the above comments were not obviously improper because they didn't refer specifically to Young's failure to take the stand and didn't generate any objection. *See id.* Instead, they referred to the lack of evidence in the record supporting Young's defense of others claim. *See People v. Medina*, 545 P.2d 702, 703 (Colo. 1976) ("While it is improper to comment intentionally on a defendant's failure to testify, it is permissible [for a prosecutor] to comment on the lack of evidence confirming defendant's theory of the case.").

¶ 44 We aren't persuaded otherwise by Young's reliance on *Griffin v. California*, 380 U.S. 609 (1965); *Howard-Walker v. People*, 2019 CO 69; and *Montoya v. People*, 457 P.2d 397 (Colo. 1969). In those cases, the prosecutor's comments were deemed improper because they explicitly referenced the defendant's failure or refusal to testify and insinuated to the jury that the defendant's withholding of information implied guilt. *Griffin*, 380 U.S. at 610-11, 613 (prosecutor stated that the defendant "would know" the circumstances around the victim's death, but that the defendant "ha[d] not seen fit to take the stand and deny or explain . . . if

20

anybody would know, this defendant would know. [The victim] is dead, she can't tell you her side of the story. The defendant won't"); *Howard-Walker*, ¶¶ 38, 44, 50 (prosecutor stated, "there is only one person in this room that could tell you where all of those items are now and he won't"); *Montoya*, 457 P.2d at 430-31 (prosecutor said, "The defendant did not testify . . . [y]ou are asked to decide what went on in his mind without hearing it from the very person, *the only person who [really] knows . . . from the person who really knows, we heard nothing*") (emphasis added). The prosecutor's comments here are distinguishable and are not so "flagrantly, glaringly, or tremendously improper" as to warrant reversal. *Domingo-Gomez*, 125 P.3d at 1053.

### 2. "Defendant's perspective" Comments

¶ 45      We analyze jointly the second and third comments with which Young takes issue:

> The defense would like you to use other witnesses as surrogates for the defendant, but you just can't because they're in different position than he was . . . . They don't have the same opportunity that he does to perceive and react. They don't work as surrogates for the defendant's perspective.
>
> . . .

[Witnesses on the on-ramp] have no earthly clue what the highway looked like at the time, much less what it looked like to this defendant at that time . . . . And the ladies in the Wall of Moms, same thing. They can't give you the defendant's perspective. They can't tell you what the road looked like to him at the time that he's watching the Jeep not hit anyone, and deciding whether or not to start shooting.

¶ 46 Viewed in context, these comments don't refer to Young's exercise of his right to silence. The first comment referred to other protesters who testified at trial and was part of a longer discussion establishing that their perspective was different from Young's because they were closer to the Jeep when it crashed and continued to drive down the highway. Therefore, argued the prosecutor, the jury couldn't use those witnesses' perceptions as evidence that Young's fear was reasonable because Young was farther away from the Jeep and had more time to recognize that it wasn't a threat. This was a fair comment on inferences the jury could (or couldn't) draw from the evidence. *Cf. People v. McBride*, 228 P.3d 216, 221 (Colo. App. 2009) (noting that a prosecutor may make arguments based on reasonable inferences that can be drawn from facts in evidence).

¶ 47    The second comment referred to other individuals at the protest who weren't called to testify.  The prosecutor specified that this comment was a response to Young's insinuation during opening statements that the prosecution didn't plan to call certain witnesses who saw what happened on the highway.  The response — that those witnesses couldn't illuminate Young's perspective because they couldn't see what the highway looked like after the crash — was a fair response to defense counsel's argument.  *People v. Sanders*, 2022 COA 47, ¶ 44 ("[P]rosecutors are afforded considerable latitude when they are replying to arguments made by the defense.").

### 3.    "Opportunity" Comment

¶ 48    During rebuttal closing, the prosecutor argued:

> The defendant had the opportunity to see –
> after he turned around after the collision, to
> see the Jeep, with enough time to make a
> reasonable decision, and instead he pulled out
> the gun, he aimed at it, he intended to fire at
> the Jeep driver, but he hit other victims; that's
> what the facts prove in this case.
>
> *There were other people who were afraid from
> their positions, understandably.  But your
> decision on these elements is about the
> defendant's mental state, not other people.  And
> he had that opportunity.*  He could have taken

23

> many other steps that were less excessive, less
> unreasonable, that wouldn't have injured other
> victims, and he didn't.  He could have pulled
> the gun and looked at what was happening,
> and decided not to fire, he could have just put
> it away.

(Emphasis added.)

¶ 49   Young's briefing quotes the italicized portion of the statement in isolation and argues that it is an impermissible comment on his right to silence.  Read in context, however, the "opportunity" the prosecutor referred to wasn't the opportunity to testify.  Instead, the prosecutor was referring to Young's chance to see that the Jeep wasn't a threat and make a different, "less unreasonable" decision.  While perhaps inartful, the comment wasn't improper.  *People v. Samson*, 2012 COA 167, ¶ 30 ("[B]ecause arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful.").

### 4.   Pre-arrest Conduct

¶ 50   The final statement Young challenges is as follows:

> This defendant didn't go over and tell that
> officer what had just happened, tell that officer
> about this exceedingly reasonable thing he had
> just done, this heroic thing against this threat,

24

this obvious threat to everyone's lives.  Why not?  It's because he knew what he had done was not reasonable.  He knew it.

¶ 51    This comment wasn't a reference to Young's decision not to testify, but instead discussed his pre-arrest conduct.  A prosecutor may properly comment on such conduct, particularly when it occurred (as it did here) in a noncustodial setting, without violating the Fifth Amendment.  *People v. Coke*, 2020 CO 28, ¶¶ 12-14 (stating that the Fifth Amendment right against self-incrimination only attaches to defendant statements that are testimonial, incriminating and compelled); *People v. Thomas*, 2014 COA 64, ¶¶ 25-26 (stating that the Fifth Amendment does not apply to conduct occurring outside custody and interrogation; therefore, admission of a defendant's pre-arrest silence in a noncustodial setting did not violate his right against self-incrimination).  Accordingly, this comment wasn't improper.

¶ 52    For all these reasons, we discern no prosecutorial misconduct in closing arguments.

V.    Communication Regarding Juror Travel Plans

¶ 53    Young contends that the court erred by holding an ex parte discussion with the jury about one juror's travel plans, thereby

25

violating Young's rights to counsel and to be present. Additionally, Young argues that the trial court erred by failing to inquire further about the details of the travel plans during deliberation.

## A. Additional Facts

¶ 54 On March 29, the fifth day of trial, a juror who was not an alternate informed the bailiff that she had a flight at 1:15 p.m. on April 1. On the record but outside the jury's presence, the court decided against releasing the juror at that time, stating, "I think we have to wait and see how the evidence goes." Defense counsel didn't object. The same day, the trial court told counsel that another juror had tested positive for COVID-19.

¶ 55 The next day, with parties and counsel present but outside the jury's presence, the court announced that it had released the sick juror and would proceed with the remaining thirteen jurors. When the issue of the traveling juror was raised again, the court said that if jury deliberations didn't begin by the afternoon of the following day (March 31), the court would consider releasing the traveling juror. The court then asked the parties for permission to enter the jury room and inform the members about the sick juror who had been released. Neither party objected.

¶ 56    Upon returning from the jury room, the court said,

> I explained the situation to our remaining
> jurors, and I told them that another juror . . .
> has expressed concerns about travel plans on
> Friday, that I am not going to excuse that juror
> at this time, I'm going to wait and see what our
> schedule looks like, what progress we make,
> and if I need to excuse that juror at a later
> time, I will . . .  I asked if any of the jurors had
> any questions or concerns, and nobody had
> any concerns.

¶ 57    Both the prosecution and defense counsel responded, "Thank you."  Defense counsel didn't object or ask for any relief.

¶ 58    Jury deliberations began the morning of March 31 — the day before the traveling juror's flight.  Later that afternoon, outside the jury's presence, the trial court told counsel that because of the traveling juror's plans, "I intend to have the jury continue deliberating tonight, rather than come back tomorrow morning, and let them go . . . as late as they need this evening in order to reach a verdict."  However, the court said that if the jury needed to break for the evening and continue deliberations in the morning, it would arrange for that.

¶ 59    Defense counsel argued that the timing of deliberations and the juror's travel plans could potentially produce a coerced verdict

and requested that the court get more details from the traveling juror about their plans.

¶ 60 The court explained that it hadn't initiated or received any communication with the jury about the travel plans since deliberations began and that it was "not inclined" to interrupt deliberations. Defense counsel repeated his concern but agreed with the court that whether continued deliberations "convey[ed] pressure" to the traveling juror was speculative.

¶ 61 The court then tried to clarify defense counsel's objection and discern what relief he requested. Counsel clarified that (1) he believed there was coercion because the juror had previously communicated her travel plans to the court and (2) he objected to continued deliberations unless the court questioned the juror further about their travel. The court did not immediately rule on the issue, instead saying that it would take a break and return after a "few minutes." When the court returned, the jury had reached a verdict. The court said it would receive the verdict at 5:45 p.m. and take a recess until then.

## B. Applicable Law

¶ 62    The right to counsel exists at every critical stage of a criminal proceeding. U.S. Const. amend. VI; Colo. Const. art. II, § 16. Stages of criminal proceedings have been held to be "critical" where there exists more than a "minimal risk" that the absence of the defendant's counsel might impair the defendant's right to a fair trial. *Gilbert v. California*, 388 U.S. 263, 267 (1967); *Sandoval v. People*, 473 P.2d 722, 725 (Colo. 1970). "[A]n impromptu conference with the jury during its deliberations may constitute a critical stage of the proceedings even where the discussions are purportedly confined to 'scheduling' matters . . . ." *Key v. People*, 865 P.2d 822, 825 (Colo. 1994).

¶ 63    "A court may not impose a deadline on deliberations that prevents the jury from reaching a well-considered verdict." *Martin v. People*, 2014 CO 68, ¶ 25. "[D]iscussing scheduling pressure with the jury may be coercive if those discussions effectively impose a deadline for the jury to end its deliberations with a verdict or have a mistrial declared." *Id.*; *see also People v. Urrutia*, 893 P.2d 1338, 1343 (Colo. App. 1994) ("Discussing scheduling problems with the jury may . . . be coercive if those scheduling problems create an

29

impression that the jury is under a short time limit to reach a verdict.").

## C. Ex Parte Conversation

### 1. Preservation and Standard of Review

¶ 64    The parties disagree about whether this issue was preserved. Young argues that the issue is preserved because he had no opportunity to object to the court's ex parte conversation before it took place. We agree that Young couldn't have prevented the conversation about the juror's travel plans because he didn't know that the court would discuss the travel issue with the jury. Nevertheless, we also agree with the People that Young had the opportunity to raise an objection to the ex parte communication and request relief when the court informed the parties about the conversation immediately after it took place. He did neither. Instead, he asked the court to question the juror the next day, during deliberations. To the extent this was a request for relief, it was too late to preserve any objection. *See People v. Richardson*, 2018 COA 120, ¶¶ 29-32 (holding that defendant failed to preserve any error stemming from the trial judge's wife serving on the jury

when he failed to timely raise his objection). We therefore conclude that this issue isn't preserved.

¶ 65    Because the issue is unpreserved, we review it for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14. "Plain error is obvious and substantial." *Id.* We reverse under the plain error standard only if the error "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the . . . conviction." *Id.* (citation omitted).

## 2.    Analysis

¶ 66    Assuming, without deciding, that the court erred by communicating ex parte with the jury about the traveling juror's flight, any error doesn't merit reversal.

¶ 67    Young contends that the court's discussion created a possibility that the traveling juror might feel coerced to reach a quick verdict in order to make her flight, and counsel needed to be present to assess the juror's reaction and decide whether to ask that she be excused or move for a mistrial. But while scheduling discussions may be coercive if they "effectively impose a deadline" for the jury to reach a verdict, *Martin*, ¶ 25, we perceive nothing about the court's conversation that could be seen as coercive or

31

that suggested that the jury had to adhere to any particular schedule. To the contrary, the court simply informed the jurors that it would "wait and see what our schedule looks like" and that it would excuse the traveling juror if necessary. The court did not suggest that either the trial schedule or the juror's travel plans would need to be altered, set a deadline on deliberations, or otherwise suggest that it would need to take action to accommodate the juror's concerns. Accordingly, Young's and his counsel's absence from this discussion did not "so undermine[] the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the . . . conviction." *Hagos*, ¶ 14.

### D. Juror Coercion

#### 1. Standard of Review

¶ 68    Initially, we agree with the People that we review for an abuse of discretion a trial court's decision regarding whether to question jurors during deliberations about possible pressure to reach a verdict. *Cf. Gibbons v. People*, 2014 CO 67, ¶¶ 12, 31 (noting that trial courts have discretion about whether to give supplemental instructions or declare a mistrial when faced with a possible deadlock because "[t]he trial judge has eyes and ears on the

32

situation as it unfolds" and "[a]ddressing the fluid dynamics" in that situation is "a quintessential trial court responsibility").

## 2. Analysis

¶ 69 The parties disagree about whether the court ruled on Young's request to question the juror. We need not resolve this dispute, however, because even assuming that the court denied the request, we perceive no abuse of discretion.

¶ 70 Relying on *Key*, 865 P.2d at 823-27, Young argues that the court was required to question the juror to ensure that there wasn't a coerced verdict because the traveling juror's flight might have induced her to sacrifice her honestly held beliefs for the sake of her travel plans. However, *Key* is distinguishable. In that case, the trial court interrupted deliberations to discuss the jurors' schedules shortly before the winter holidays. *Id.* at 824. The court suggested that the jury return to deliberate on New Year's Eve, creating significant scheduling conflicts for two jurors. *Id.* The Colorado Supreme Court concluded that the court's scheduling decision created the equivalent of an improper "time-fuse" instruction for the jurors with the conflicts. *Id.* at 825.

¶ 71    For the reasons discussed above, the trial court's ex parte, predeliberation conversation with the jurors about the traveling juror is distinguishable because it did not suggest a schedule or deadline of any kind.  Moreover, the court had not received any communication from the jury during deliberations indicating that the traveling juror had further concerns about missing her flight.  As defense counsel acknowledged, any concern about coercion was "speculation."  If anything, *Key* counsels *against* interrupting deliberations to discuss scheduling conflicts, and we agree with the trial court that questioning the juror about her travel plans under these circumstances may have drawn unnecessary attention to the issue.

¶ 72    Finally, we reject Young's assertion that it was coercive to continue to allow the jury to deliberate past regular business hours without questioning the traveling juror.  Again, the court had not received any communication from the jury indicating it was concerned about the hour or needed a break.  Young doesn't cite, and we haven't found, any case indicating that the court is required to inquire about possible time pressure that members of the jury might feel during deliberations.  Additionally, the record reflects

that, if the jury deliberated past business hours, it wasn't long. After the court announced that the verdict had been reached, it said that the verdict would be read at 5:45 p.m. and that it would recess until that time.

¶ 73　　Under these circumstances, the court didn't abuse its discretion by declining to interrupt deliberations to discuss the traveling jurors' schedule.

## VI.　Disposition

¶ 74　　The judgment is affirmed.

JUDGE FREYRE and JUDGE GROVE concur.